**Stanley SPENCER, et al., Appellants,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, et al.**

No. 82–1851.

United States Court of Appeals, District of Columbia Circuit.

Argued March 22, 1983.

Decided June 28, 1983.

---

Michael E. Avakian, Center on National Labor Policy, Inc., North Springfield, Va., for appellants.

David R. Marshall, Atty., N.L.R.B., Washington, D.C., of the Bar of the District of Columbia, pro hac vice, by special leave of the Court, with whom Elliott Moore, Deputy Associate Gen. Counsel, and Aileen A. Armstrong, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for appellees.

Before MIKVA and EDWARDS, Circuit Judges, and SWYGERT,[*] Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The appellants, a group of electrical and mechanical engineers employed by an electric utility company, seek attorneys' fees from the National Labor Relations Board ("NLRB" or "Board") for legal expenses incurred in the course of their ultimately successful quest for a separate representation election. The appellants rely on section 204(a) of the Equal Access to Justice Act ("EAJA" or "the Act"), 28 U.S.C. § 2412 (Supp. V 1981), which provides, *inter alia,* that, in a suit brought by or against the United States, the court shall award attorneys' fees to a private prevailing party who satisfies certain financial eligibility requirements, unless "the position of the United States was substantially justified or ... special circumstances make an award unjust."[1] The District Court, 548 F.Supp. 256, found that the appellants met the eligibility requirements and had "prevailed" within the meaning of the Act. The court denied their application for attorneys' fees, however, on the ground that the position taken by the Board was substantially justified. The appellants contest the latter ruling.

Resolution of this appeal necessitates an inquiry into the theory and practice of the EAJA. We begin by construing two crucial, ambiguous phrases used in the Act— "the position of the United States" and "substantially justified." Next, we consider the standard of review by which a court of appeals should scrutinize a trial judge's determination of a party's entitlement to fees. We then bring our analysis to bear on the District Court's judgment in the case before us. We conclude that the court's findings and rulings were proper and accordingly affirm.

## I. BACKGROUND

In 1938, the Utah Power and Light Company ("the Company") voluntarily recognized Local 57 of the International Brotherhood of Electrical Workers ("the Union") as the exclusive bargaining representative of its employees. The Company and Union agreed that the bargaining unit would consist of all employees except management personnel and supervisory officials with the authority to hire and fire. Included in the unit, consequently, were non-supervisory engineers. The NLRB assented to the parties' "stipulation" and certified the Union.[2]

By 1978, there were 2,600 employees in the bargaining unit, approximately 100 of whom were highly educated electrical or mechanical engineers. During that year, 72 of the engineers filed a petition with the Board, seeking decertification of the Union as their bargaining representative. In support of their request, they argued that, as professional employees, section 9(b) of the

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

[1] The pertinent provisions of the Act are set forth in notes 18–24 *infra* and explicated in the accompanying text.

[2] Certification, Utah Power & Light Co., XXII–R–20 (Sept. 30, 1938), *reprinted in* Appendix ("App.") 15.

National Labor Relations Act (as amended) guaranteed them a right to vote as a separate group regarding union representation.[3] Regional Director Francis Spearandeo dismissed the engineers' petition, on the ground that "[t]he Board's established policy and general rule is that the unit appropriate in a decertification election must be coextensive with the unit previously certified or the unit recognized."[4] The Board denied the engineers' petition for review of the dismissal.

In 1979, the engineers amended their petition to request clarification of the scope of the bargaining unit. The Regional Director dismissed this petition as well, on the ground that the engineers constituted neither a labor organization nor an employer and therefore lacked standing under the Board's regulations[5] to petition for unit clarification.[6]

Having failed to secure relief from the NLRB, the engineers sought the aid of the judiciary. In September 1979, they brought suit in the District Court for the District of Columbia against both Spearandeo and the Board.[7] They requested a declaration that they were indeed "professionals" within the meaning of section 2(12) of the National Labor Relations Act[8] and an injunction compelling the Board to provide them a separate representation election. The Board admitted most of the factual allega-

tions in the complaint, but responded that the engineers nevertheless had failed to state a claim on which relief could be granted and that the District Court lacked subject matter jurisdiction over the controversy.[9] The parties then filed cross-motions for summary judgment.

In 1980, while the case was pending in the District Court, two of the engineers filed a second decertification petition with the Board. This time the Board acceded to the petitioners' request. *Utah Power & Light Co.,* 258 N.L.R.B. 1059 (1981). The Board reasoned that the situation was "unique" insofar as "the professional employees seeking decertification have never had an opportunity to vote in a self-determination election"; under these special circumstances, it decided, "the policies inherent in Section 9(b)(1)" warranted making an "exception" to the general rule (which it reaffirmed) that a decertification election will not "normally" be ordered "in a unit not coextensive with the existing unit." *Id.* at 1061 (footnote omitted).

The long-sought-after election was held on October 29, 1981, and the engineers voted overwhelmingly against continued representation by the Union. Eight days later, the Board moved to dismiss as moot the engineers' complaint. The engineers did not contest the motion, responding instead with an application for costs and attorneys'

---

3. The provision relied upon by the engineers reads in pertinent part:

    The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided,* That the Board shall not (1) decide that any unit is appropriate for such purposes if such unit *includes both professional employees and* employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit . . . .

    29 U.S.C. § 159(b) (1976). The crucial proviso was added in 1947 by the Taft-Hartley Act, ch. 120, § 101, 61 Stat. 136, 143.

4. Decision and Order, No. 27–RD–459 (Dec. 22, 1978), *reprinted in* App. 22.

5. 29 C.F.R. § 102.60(b) (1978) (revised as of July 1, 1978).

6. Decision and Order, No. 27–UC–52 (Jan. 30, 1979), *reprinted in* App. 26.

7. Regional Director Spearandeo is now deceased. (And, in any case, he could only be joined as a defendant in the suit as a representative of the NLRB.) Consequently, the defendants will be referred to collectively hereinafter as "the Board."

8. The definition of "professional employee" relied upon by the engineers is set forth in 29 U.S.C. § 152(12) (1976).

9. Answer at 3 (Nov. 16, 1979), *reprinted in* App. 29. The arguments the Board subsequently advanced in support of these two defenses (and the strength thereof) are considered in Part III. *infra.*

fees under the EAJA. The Board filed a memorandum opposing the application.

On May 28, 1982, the District Court granted the Board's motion to dismiss. Finding that the engineers qualified as "prevailing parties," the court granted their motion for costs.[10] The court ruled, however, that the engineers were not entitled to attorneys' fees under either of the two arguably relevant provisions of the EAJA: first, since the engineers had not shown that the Board had acted in "bad faith," they were not entitled to an award of fees under section 2412(b); second, since the Board had sustained its burden of showing that its position was "substantially justified," appellants were precluded from receiving an award of fees under section 2412(d)(1)(A).[11]

On appeal, no party contests the dismissal of the suit itself, the finding that the engineers constituted "prevailing parties," or the allocation of costs. The engineers challenge the denial of attorneys' fees.

## II. THE EQUAL ACCESS TO JUSTICE ACT

### A. *Introduction*

■ The background against which the Equal Access to Justice Act must be viewed is the so-called "American Rule" pertaining to the allocation of costs of counsel. Under that longstanding doctrine, each litigant ordinarily must pay his own lawyer. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975).[12] The rule has only two narrow exceptions: when a loser "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons," he may be obliged to reimburse the winner for his attorneys' fees, *F.D. Rich Co. v. United States,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (dicta); *accord Lipsig v. National Student Marketing Corp.,* 663 F.2d 178, 180 (D.C.Cir.1980) (per curiam); and, when an individual litigant, by successfully maintaining a suit, has conferred a benefit on a group of persons, the court may allow him to recover his attorneys' fees from the beneficiaries, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 392–97, 90 S.Ct. 616, 625–28, 24 L.Ed.2d 593 (1970).[13] Traditionally, the United States was even less vulnerable to an award of attorneys' fees than a private litigant; in the absence of an express statutory provision, even the aforementioned "bad faith" and "common benefit" rules could not be invoked against the federal

---

**10.** The provision relied upon by the court in awarding costs was 28 U.S.C. § 2412(a) (Supp. V 1981). The pertinent portions of this provision antedate the EAJA.

**11.** Memorandum Opinion at 11–19 (filed July 1, 1982, explaining the basis of the May 28 Order), *reprinted in* App. 200–08. The two statutory provisions construed by the court are set forth in notes 19, 22 *infra.* In ruling that the Board's position was "substantially justified," the court declined to determine whether the relevant "position" was the stance taken by the Board in litigation or its original responses to the engineers' requests, holding that the Board could not be held liable for attorneys' fees under either theory. *Id.* at 12 n. *, reprinted in* App. 201.

**12.** The doctrine currently prevailing in England and in most of the rest of the world is that attorneys' fees ordinarily are awarded to the winning party. *See Alyeska,* 421 U.S. at 247 & n. 18, 95 S.Ct. at 1616 & n. 18; Comment, *Court Awarded Attorney's Fees and Equal Access to the Courts,* 122 U.Pa.L.Rev. 636, 637 & n. 3, 639–40 (1974).

**13.** The way this rule usually works in practice is that the court devises some arrangement whereby the individual litigant is able to recover his attorneys' fees from the "common fund" he has created or preserved. When the common benefits secured by the suit are nonpecuniary or are not embodied in a discrete fund, the court may order the beneficiaries or their representative to reimburse the prevailing party directly for his costs of counsel. *See Mills v. Electric Auto-Lite Co.,* 396 U.S. at 392–96, 90 S.Ct. at 625–27; Note, *The Award of Attorney's Fees Under the Equal Access to Justice Act,* 11 Hofstra L.Rev. 307, 309 (1982).

In one other unusual circumstance, attorneys' fees have traditionally been recoverable: "[I]n a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized as part of the fine to be levied on the defendant." *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967) (dicta) (citing *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–28, 43 S.Ct. 458, 465–66, 67 L.Ed. 719 (1923)).

government. *Pealo v. Farmers Home Administration of the United States Department of Agriculture*, 562 F.2d 744, 748 (D.C. Cir.1977) (alternative holding); *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397, 405 (1st Cir.1977). The protection from liability for attorneys' fees enjoyed by the United States under these circumstances derived from two sources: the general doctrine of sovereign immunity; and 28 U.S.C. § 2412, which, prior to its amendment by the EAJA, was "consistently construed as immunizing the United States against attorney's fees awards absent clear or express statutory authority to the contrary." *NAACP v. Civiletti,* 609 F.2d 514, 516 (D.C. Cir.1979), *cert. denied,* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980).

Since at least the 1920s, the restrictive American doctrine pertaining to the allocation of attorneys' fees has been subjected to persistent attack.[14] In the 1960s and early 1970s, federal courts sensitive to these criticisms began to experiment with various alternative, more liberal, fee-shifting rules. The most important of these developments was the so-called "private attorney general" theory, under which prevailing parties were allowed to recover attorneys' fees when their suits resulted in enforcement of "important societal rights."[15] In 1975, in the *Alyeska* case, the Supreme Court called a halt to this judicially managed doctrinal innovation. The Court concluded that, in view of the importance and complexity of the field and of the history of legislative involvement, "it is apparent that the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." 421 U.S. at 262, 95 S.Ct. at 1624 (footnote omitted). Consequently, it held that, in the absence of specific statutory authorization, federal courts sitting in non-diversity cases could award attorneys' fees to prevailing parties only under the established common law exceptions to the American Rule. *Id.* at 247, 257–60, 271, 95 S.Ct. at 1616, 1621–23, 1628.

The Supreme Court's message was not lost on the legislature. A year after the *Alyeska* decision, Congress passed the Civil Rights Attorney's Fees Awards Act, which allows prevailing parties in suits brought under specified civil rights statutes to recover "a reasonable attorney's fee as part of the costs."[16] The Equal Access to Justice Act, passed four years later,[17] constitutes an

**14.** *See, e.g.,* Ehrenzweig, *Reimbursement of Counsel Fees and the Great Society,* 54 Calif.L. Rev. 792 (1966); Goodhart, *Costs,* 38 Yale L.J. 849 (1929); Kuenzel, *The Attorney's Fee: Why Not a Cost of Litigation?,* 49 Iowa L.Rev. 75 (1963); Mause, *Winner Takes All: A Re-Examination of the Indemnity System,* 55 Iowa L.Rev. 26 (1969); McCormick, *Counsel Fees and Other Expenses of Litigation as an Element of Damages,* 15 Minn.L.Rev. 619 (1931); Stoebuck, *Counsel Fees Included in Costs: A Logical Development,* 38 U.Colo.L.Rev. 202 (1966); Note, *Attorney's Fees,* 43 Miss. L.J. 238 (1972); Note, *Attorney's Fees as an Element of Damages,* 15 U.Cin.L.Rev. 313 (1941); Comment, *Court Awarded Attorney's Fees, supra* note 12, at 648–55; Note, *Attorney's Fees: Where Shall the Ultimate Burden Lie?,* 20 Vand.L.Rev. 1216 (1967); Note, *Distribution of Legal Expense Among Litigants,* 49 Yale L.J. 699 (1940).

**15.** *See* Note, *Attorney's Fees Under the EAJA, supra* note 13, at 309–10; Comment, *Court Awarded Attorney's Fees, supra* note 12, at 657, 666–70. The doctrine of sovereign immunity (buttressed by 28 U.S.C. § 2412, *see* text following note 13 *supra*) precluded the recovery of attorneys' fees from the federal government under this theory. *See* Comment, *Court Awarded Attorney's Fees, supra* note 12, at 679 & n. 255. However, the inequity and frustration of public policy caused by that preclusion was mitigated by the fact that, in many of the suits against the United States or its officials in which the theory might have been invoked, private parties were joined as co-defendants. In such circumstances, the plaintiffs' costs of counsel (or some portion thereof) could be—and frequently were—recovered from the private defendants.

**16.** Pub.L. No. 94–559, 90 Stat. 2641 (1976) (codified as amended at 42 U.S.C. § 1988 (Supp. V 1981)).

**17.** Pub.L. No. 96–481, §§ 201–208, 94 Stat. 2321, 2325–30 (1980). The portions of the Act pertaining to awards by administrative agencies of attorneys' fees incurred in the course of adjudicatory proceedings before them are codified at 5 U.S.C. § 504 (Supp. V 1981). The portions pertaining to awards of fees by courts are codified at 28 U.S.C. § 2412 (Supp. V 1981).

even more comprehensive response to the Supreme Court's invitation and self-abnegation. The Act applies to all civil actions brought by or against the United States [18] and allows private prevailing parties to recover attorneys' fees from the government in a wide variety of circumstances.

Two provisions of the statute are crucial in the present case. Section 2412(b) authorizes courts to award private prevailing parties "reasonable fees and expenses of attorneys," except when such awards are "expressly prohibited by statute," and declares that "[t]he United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." [19] The most important effect of this provision is to codify and make applicable to the government the "bad faith" and "common benefit" exceptions to the American Rule. [20]

Section 2412(d)(1)(A) is more sweeping. It provides that a court "shall" award an eligible [21] private prevailing party attorneys' fees and other litigation expenses unless some other statute specifically provides otherwise or "the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." [22] Ordinary tort suits are excluded from the coverage of the provision, but the legislative history makes clear that constitutional tort actions come within its purview. [23] Section 2412(d) is avowedly experimental. Unlike section 2412(b), it contains a "sunset" provision;

---

**18.** 28 U.S.C. §§ 2412(b), (d)(1)(A) (Supp. V 1981). The only exception to this comprehensive coverage is that "cases sounding in tort" are excluded from the experimental provisions of § 2412(d)(1)(A). *See* notes 22–23 *infra* and accompanying text.

Both the Civil Rights Attorney's Fees Awards Act, *see* note 16 *supra,* and the EAJA were designed to supplement a host of more specific provisions allowing for the award of attorneys' fees in suits brought under statutes granting or protecting various federal rights. *See, e.g.,* 5 U.S.C. § 552(a)(4)(E) (1976) (Freedom of Information Act); 15 U.S.C. § 15 (Supp. V 1981) (Clayton Act); 15 U.S.C. § 77k(e) (1976) (Securities Act of 1933 [as amended] ); 15 U.S.C. §§ 78i(e), 78r(a) (1976) (Securities Exchange Act of 1934 [as amended] ); 29 U.S.C. § 107(e) (1976) (Norris-LaGuardia Act); 42 U.S.C. §§ 2000a–3(b), 2000e–5(k) (1976) (Civil Rights Act of 1964). For a comprehensive, current enumeration of these provisions, see 6 ATTORNEY FEE AWARDS REP. No. 3, at 2–3 (1983).

**19.** The full text of the provision reads:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to [§ 2412(a) ], to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C. § 2412(b) (Supp. V 1981).

**20.** *See* H.R.REP. No. 1418, 96th Cong., 2d Sess. 9 (1980); S.REP. No. 253, 96th Cong., 1st Sess. 1, 4 (1979); H.R.REP. No. 1434, 96th Cong., 2d Sess. 25 (1980) (conference report), U.S.Code Cong. & Admin.News 1980, 4953. The two exceptions to the American Rule are discussed in the text at note 13 *supra.*

**21.** To be able to invoke the provision, parties must meet certain financial requirements, set forth in § 2412(d)(2)(B). As critics of the Act were wont to observe, the eligibility ceilings are sufficiently high as to exclude relatively few persons from the benefits of the statute.

**22.** The full text of the provision reads:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to [§ 2412(a) ], incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (Supp. V 1981). The kinds of "fees and other expenses" (among which is "reasonable attorney fees") that can be recovered under this provision are described in 28 U.S.C. § 2412(d)(2)(A) (Supp. V 1981).

**23.** *See* H.R.REP. No. 1418, *supra* note 20, at 18; Note, *Attorney's Fees Under the EAJA, supra* note 13, at 313.

unless reenacted before October 1, 1984, it will be automatically repealed.[24]

Because of the large bodies of case law defining the contours of the two traditional exceptions to the American Rule, interpretation and application of section 2412(b) usually is relatively straightforward.[25] Section 2412(d)(1)(A), unfortunately, is much more difficult to apply. It is not grounded in any body of common law doctrine. Because of its recent vintage, it has not yet acquired a discernible gloss of judicial interpretation. And, most importantly, several of its crucial terms are distressingly ambiguous. For reasons that will become apparent, two of those terms—*"the position of the United States"* and *"substantially justified"*—loom large in the case before us. Before proceeding, therefore, we must bring those phrases into sharper focus. And, of course, we must strive to lend them shapes that will make them meaningful vehicles, not only for disposing of the case at hand, but for resolving other controversies that come within the broad coverage of the provision.

**24.** Pub.L. No. 96–481, § 204(c), 94 Stat. 2321, 2329 (1980) (codified at 28 U.S.C. § 2412 note (Supp. V 1981)).

**25.** *See, e.g., Fitzgerald v. Hampton,* 545 F.Supp. 53, 56–60 (D.D.C.1982).

**26.** *See* note 22 *supra.*

**27.** *See Natural Resources Defense Council v. U.S. Environmental Protection Agency,* 703 F.2d 700, 707 (3d Cir.1983); *Boudin v. Thomas,* 554 F.Supp. 703, 705–06 & n. 7 (S.D.N.Y.1982); *Environmental Defense Fund v. Watt,* 554 F.Supp. 36, 40–41 (E.D.N.Y.1982); *MacDonald v. Schweiker,* 553 F.Supp. 536, 540–41 (E.D.N.Y.1982); *Cornella v. Schweiker,* 553 F.Supp. 240, 242 n. 3 (D.S.D.1982) (dicta); *Globe, Inc. v. United States,* 553 F.Supp. 7, 9 (D.D.C.1982) (semble); *Moholland v. Schweiker,* 546 F.Supp. 383, 386 (D.N.H.1982); *Nunes-Correia v. Haig,* 543 F.Supp. 812, 816 (D.D.C.1982); *Citizens Coalition for Block Grant Compliance v. City of Euclid,* 537 F.Supp. 422, 426 (N.D.Ohio 1982) (semble: litigation position should be examined only when the court "has insufficient information to determine the reasonableness of the government's underlying action"); *Costantino v. United States,* 536 F.Supp. 60, 61 (E.D.Pa. 1981) (semble); *Wolverton v. Schweiker,* 533 F.Supp. 420, 425 (D.Idaho 1982); *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348, 352 (D.D.C. 1982).

B. *"The Position of the United States"*

■ The statute permits the government, when it loses a case, to avoid liability for attorneys' fees if it can show that its "position" was substantially justified.[26] The government's "position," for these purposes, might mean one of two things. First, the term could refer to the governmental action that precipitated the lawsuit. Second, it could refer to the posture assumed by the government in litigation. These two interpretations have come to be known, respectively, as the *"underlying action"* and the *"litigation position"* theories.

The judiciary has yet to settle on one or another construction. As of the end of March of 1983, the issue had been addressed (explicitly or implicitly) in twenty-two decisions. In twelve of those cases, the court opted for the "underlying action" theory.[27] In the other ten, the court opted for the "litigation position" theory.[28] This circuit has not yet been confronted with the issue.

**28.** *See Kay Mfg. Co. v. United States,* 699 F.2d 1376, 1379 (Fed.Cir.1983); *Gava v. United States,* 699 F.2d 1367, 1370 (Fed.Cir.1983); *Tyler Business Servs. v. NLRB,* 695 F.2d 73, 75 (4th Cir.1982); *Broad Ave. Laundry & Tailoring v. United States,* 693 F.2d 1387, 1390 (Fed.Cir. 1982); *S & H Riggers & Erectors, Inc. v. OSHRC,* 672 F.2d 426, 430–31 (5th Cir. Unit B 1982) (semble); *Grand Boulevard Improvement Ass'n v. City of Chicago,* 553 F.Supp. 1154, 1162–63 (N.D.Ill.1982); *Lauritzen v. Secretary of the Navy,* 546 F.Supp. 1221, 1226 & n. 6 (C.D.Cal.1982); *Operating Eng'rs Local Union No. 3 v. Bohn,* 541 F.Supp. 486, 495–96 (D.Utah 1982); *Berman v. Schweiker,* 531 F.Supp. 1149, 1154 (N.D.Ill.1982) (semble); *Alspach v. District Director of Internal Revenue,* 527 F.Supp. 225, 228 (D.Md.1981).

The "underlying action" theory is commonly regarded as the more expansive of the two options. Accordingly, several of the courts that have adopted it have indicated their willingness to hold the government liable for attorneys' fees if *either* its underlying action or its subsequent litigation position lacked substantial justification. *See, e.g., NRDC v. EPA,* 703 F.2d at 711–12; *Boudin v. Thomas,* 554 F.Supp. at 705–06 & n. 7; *Environmental Defense Fund v. Watt,* 554 F.Supp. at 40–41; *MacDonald v. Schweiker,* 553 F.Supp. at 540–41; *Nunes-Correia v. Haig,* 543 F.Supp. at 816. In the course of our analysis, we will consider the desirability and practicability of such a com-

The case law, in sum, affords us little aid in attempting to construe "the position of the United States." We are obliged, therefore, to conduct our own inquiry.[29]

### 1. Legislative Intent

The statute itself contains no clear indication of which of the readings is correct. Section 2412(d)(1)(A) does not explicate the term. And section 2412(d)(2), the definitional provision, makes no reference to "the position of the United States."

Only two provisions of the Act offer any guidance, and they point in inconsistent directions. First, section 2412(d)(2)(C) indicates that the term "'United States' includes any agency and any official of the United States acting in his or her official capacity."[30] As the Third Circuit observed in a recent case, this encompassing definition provides some support for the "underlying action" theory, both because of its use of the word "acting" and because of the fact that most of the "officials" referred to by the provision would be incapable of taking a position in litigation. *Natural Resources Defense Council v. U.S. Environmental Protection Agency*, 703 F.2d 700, 707 (3d Cir.1983). However, the support that this definitional provision lends to the "underlying action" theory is at best modest. As Judge Hunter pointed out in his dissent in *NRDC*, the definitional section might plausibly be read as nothing more than an acknowledgment of the fact "that the government as an entity can only take a 'position,' whatever the meaning of that term, through its agencies and the individuals who administer its agencies." *Id.* at 718 n. 2. Second, section 2412(d)(3) directs a court, when reviewing adversary adjudications before administrative agencies, to award to a private party who prevails on appeal the attorneys' fees he incurred in the course of his litigation before the agency,[31] unless the court finds "that *during such adversary adjudication* the position of the United States was substantially justified, or that special circumstances make an award unjust."[32] As the highlighted language indicates, the provision presumes that the government's "position," for the purpose of assessing its liability for attorneys' fees resulting from administrative adjudication, is the stance it adopted in litigation before the

---

posite approach. *See* text at note 61 *infra.* For now, however, we will discuss the two theories as if they were mutually exclusive alternatives.

**29.** The reason such an inquiry is necessary and appropriate, despite the fact that the District Court did not reach this issue, *see* note 11 *supra,* will become apparent in Part III. *infra.* To anticipate somewhat, the Board, in litigation before the District Court, took the position, not that its actions were legally correct, but that they were not so flagrantly violative of an express statutory prohibition as to warrant exercise of jurisdiction by the District Court. *See* text at note 93 *infra.* That argument might have been "substantially justified" even if the Board's interpretation of its enabling act were clearly incorrect. The meaning of "the position of the United States" thus becomes crucial. If the phrase is defined as the government's underlying action, we must pass upon the District Court's holding that the Board's denial of the appellants' two petitions was "substantially justified." If, by contrast, the phrase is defined as the government's litigation position, we need not consider that aspect of the court's ruling and can confine our attention to the court's assessment of the strength of the Board's argument that it had not stepped so plainly beyond

the boundaries defined by the National Labor Relations Act as to justify judicial intervention.

**30.** 28 U.S.C. § 2412(d)(2)(C) (Supp. V 1981).

**31.** More specifically, the provision instructs the court, when awarding attorneys' fees (under § 2412(d)(1)(A)) to a private party who prevails on appeal, to include in its award "fees and other expenses to the same extent authorized in" 5 U.S.C. § 504(a) (Supp. V 1981), which provides:

(1) An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency *as a party to the proceeding* was substantially justified or that special circumstances make an award unjust.

(emphasis added). Note that this provision, like § 2412(d)(3) itself, takes for granted that "the position of the United States," in the administrative context, is its litigation position. *See* text at note 33 *infra.*

**32.** 28 U.S.C. § 2412(d)(3) (Supp. V 1981) (emphasis added).

agency. It remains possible, of course, that the phrase "position of the United States" was intended to have a different meaning when used in the context of litigation before the courts, but if Congress contemplated such a difference, it failed to indicate as much in the statute. In short, the unequivocal adoption of the "litigation position" theory in section 2412(d)(3) suggests that the identical phrase, when used without qualification in section 2412(d)(1)(A), should be interpreted as the posture adopted by the government before the court.[33]

On balance, we think that the support lent the "litigation position" theory by section 2412(d)(3) is somewhat stronger than that lent the "underlying action" theory by the definitional provision in section 2412(d)(2)(C). We concede, however, that the scales do not tip decisively one way or the other. One would hope that the legislative history would make possible a clean resolution of this issue. Unfortunately, study of relevant statements made by proponents and opponents of the bill proves even more inconclusive.

Neither the committee reports nor the debates contain an explicit statement purporting to construe "the position of the United States." The legislative history is, however, rife with arguments that take for granted one or the other option. Unfortunately, the number that seem founded on the "underlying action" theory is roughly the same as the number that seem founded on the "litigation position" theory. Those various references have been canvassed

elsewhere;[34] for present purposes, it will suffice to note the most important.

Strong support for the "litigation position" theory is provided by the language used in both committee reports to describe the standard of liability under section 2412(d)(1)(A): "Where the Government can show that *its case* had a reasonable basis both in law and fact, no award [of attorneys' fees] will be made." H.R.REP. No. 1418, *supra* note 20, at 10; S.REP. No. 253, *supra* note 20, at 6 (emphasis added) U.S. Code Cong. & Admin.News 1980, at 4989. Other statements, also appearing in both reports, suggest (at least when read in isolation) that Congress was exclusively concerned with irresponsible governmental decisions to initiate or continue litigation:

> A court should look closely at cases ... where there has been a judgment on the pleadings or where there is a directed verdict or where a prior suit on the same claim had been dismissed. Such cases clearly raise the possibility that the Government was unreasonable *in pursuing the litigation.*
>
> The standard, however, should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that *its decision to litigate* was based on a substantial probability of prevailing.

H.R.REP. No. 1418, *supra* note 20, at 11; S.REP. No. 253, *supra* note 20, at 6–7 (emphasis added)[35] U.S.Code Cong. & Admin. News 1980, at 4989.

---

**33.** The foregoing inference is reinforced somewhat by the language of § 2412(d)(1)(C). That provision authorizes a court, "in its discretion," to "reduce the amount to be awarded pursuant to this subsection, or deny an award, to the extent that the prevailing party during the course of the proceedings engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy." 28 U.S.C. § 2412(d)(1)(C) (Supp. V 1981). The linkage thus established between the size of the award and the *private party's* behavior in litigation is at least consistent with an assumption that the predicate for an award is the *government's* unreasonable behavior in litigation.

**34.** *See NRDC v. EPA,* 703 F.2d at 707–11; *id.* at 714–15 (Thompson, J., concurring); *id.* at 718–20 (Hunter, J., dissenting); *Alspach v. District Director of Internal Revenue,* 527 F.Supp. at 228–29.

**35.** For discussion of the light these passages cast on the meaning of the requirement that the government's position be "substantially justified," see text at note 66 *infra.* For other statements in the legislative history supportive of the "litigation position" theory, see, *e.g.,* H.R. REP. No. 1418, *supra* note 20, at 20; 126 CONG.REC. H10,230 (daily ed. Oct. 1, 1980) (statement of Rep. Broomfield); *id.* at H10,222 (statement of Rep. Danielson); *id.* at H10,221

One can find equally evocative statements, however, supportive of the "underlying action" theory. For example, in defending the decision to place on the government the burden of demonstrating that its position was substantially justified,[36] both committee reports argue that "it is far easier for the Government, which has control of the evidence, to prove *the reasonableness of its action* than it is for a private party to marshal the facts to prove that the Government was unreasonable." H.R.REP. No. 1418, *supra* note 20, at 11; S.REP. No. 253, *supra* note 20, at 6 (emphasis added), U.S. Code Cong. & Admin.News 1980, at 4989. The conclusions to both reports declare: "Thus, by allowing an award of reasonable fees and expenses against the Government *when its action is not substantially justified,* S. 265 provides individuals an effective legal or administrative remedy where none now exists." H.R.REP. No. 1418, *supra* note 20, at 12; S.REP. No. 253, *supra* note 20, at 7 (emphasis added), U.S.Code Cong. & Admin. News 1980, at 4991. And, in the floor debates, both supporters and critics of the bill frequently manifested their assumption

that liability for fees would turn upon the strength of the government's justification for its regulatory behavior, rather than the colorability of the legal arguments subsequently advanced in support of that conduct.[37]

We have thus arrived at an impasse; we must acknowledge that Congress failed clearly to resolve the question before us. To answer it, consequently, we must enlarge our field of vision; we must try to discern the underlying purposes of the Act as a whole, and then determine which of the two possible definitions of "the position of the United States" would best serve those ends.

## 2. A Practicable Definition

The central objective of the EAJA, and of section 2412(d)(1)(A) in particular, was to encourage relatively impecunious private parties to challenge unreasonable or oppressive governmental behavior by relieving such parties of the fear of incurring large litigation expenses.[38] Achievement of that

(statement of Rep. Bereuter); 125 CONG.REC. 21,444–45 (1979) (statement of Sen. Kennedy); *id.* at 21,439 (statement of Sen. Ford) ("If the agencies choose their cases carefully they will be completely unaffected by this legislation. The only time that this legislation would be applicable is if the Government is unable to show that a case that it brought is 'substantially justified.' ").

**36.** *See* text at notes 63–64 *infra.*

**37.** *See, e.g.,* 126 CONG.REC. H10,219 (daily ed. Oct. 1, 1980) (statement of Rep. McDade) ("All we are saying is that this Government must regulate in a reasonable way, and if it does not, then it must be held liable for that small businessman's costs and attorney's fees."); 125 CONG.REC. 21,442 (1979) (statement of Sen. Helms); *id.* at 21,438 (statement of Sen. Domenici); *id.* at 1441 (statement of Sen. Domenici) (acknowledging that the bill would award attorneys' fees to a private prevailing party "[i]f the Government could not substantiate the position that it has taken, that the citizen seeks to have overturned").

**38.** The preamble to the Act states this goal succinctly:

(a) The Congress finds that certain individuals, partnerships, corporations, and labor

and other organizations may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense involved in securing the vindication of their rights in civil actions and in administrative proceedings.

(b) The Congress further finds that because of the greater resources and expertise of the United States the standard for an award of fees against the United States should be different from the standard governing an award against a private litigant, in certain situations.

(c) It is the purpose of this title—

(1) to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States . . . .

Pub.L. No. 96–481, § 202, 94 Stat. 2321, 2325 (1980). *See also* H.R.REP. No. 1418, *supra* note 20, at 5–6, 9–10, 12; S.REP. No. 253, *supra* note 20, at 1, 5, 7; H.R.REP. No. 1434, *supra* note 20, at 21. Virtually every congressman who spoke in support of the bill argued that its principal goal was to reduce deterrents to litigation—to give citizens the ability and incentive to challenge, instead of submit to, unreasonable regulation or other governmental action. For especially pungent statements of this sort, see, *e.g.,*

end, it was believed, would promote three more general goals. First, Congress hoped to provide relief to the victims of abusive governmental conduct, to enable them to vindicate their rights without assuming enormous financial burdens.[39] Second, it sought to reduce the incidence of such abuse; it anticipated that the prospect of paying sizeable awards of attorneys' fees when they overstepped their authority and were challenged in court would induce administrators to behave more responsibly in the future.[40] Third, by exposing a greater number of governmental actions to adversarial testing, Congress hoped to refine the administration of federal law—to foster greater precision, efficiency and fairness in the interpretation of statutes and in the formulation and enforcement of governmental regulations.[41]

Single-minded pursuit of the foregoing goals would have induced Congress to enact a law providing for the automatic award of attorneys' fees to private parties who prevailed in suits against the government. Congress did not go that far, however, because of its sensitivity to two other considerations. First, it did not wish to inhibit legitimate efforts by the executive to enforce the law.[42] Second, it feared the potentially huge cost to the government of an

---

125 Cong.Rec. 21,444 (1979) (statement of Sen. Kennedy); *id.* at 21,442 (statement of Sen. McClure) ("In far too many cases, a party will knuckle under to a Federal order he knows to be wrong because he cannot afford the cost of taking the matter to court."); *id.* at 21,441 (statement of Sen. Thurmond); *id.* at 1439 (statement of Sen. DeConcini).

39. *See, e.g.,* 126 Cong.Rec. H10,230 (daily ed. Oct. 1, 1980) (statement of Rep. Baldus); 125 Cong.Rec. 21,444 (1979) (statement of Sen. Kennedy); *id.* at 21,443 (statement of Sen. Nelson); *id.* at 21,435–36 (statement of Sen. Culver); *id.* at 21,435 (statement of Sen. DeConcini).

40. *See* H.R.Rep. No. 1418, *supra* note 20, at 12; S.Rep. No. 253, *supra* note 20, at 13; 126 Cong. Rec. H10,229 (daily ed. Oct. 1, 1980) (statement of Rep. Symms); *id.* at H10,229 (statement of Rep. Heckler); *id.* at H10,226 (statement of Rep. Smith); 125 Cong.Rec. 21,444 (1979) (statement of Sen. Bayh); *id.* at 21,443 (statement of Sen. Nelson); *id.* at 21,441 (statement of Sen. Thurmond); *id.* at 21,436 (statement of Sen. Dole). Significantly, a frequently cited example of such reformed behavior was an increased willingness on the part of government lawyers to consider which cases truly merited pursuit. *See, e.g.,* H.R.Rep. No. 1418, *supra* note 20, at 20; 126 Cong.Rec. H10,226 (daily ed. Oct. 1, 1980) (statement of Rep. Smith); 125 Cong.Rec. 21,443 (1979) (statement of Sen. Nelson).

41. An apt explanation of this objective can be found in H.R.Rep. No. 1418, *supra* note 20, at 10 and S.Rep. No. 253, *supra* note 20, at 5–6, U.S. Code Cong. & Admin.News, 1980, at 4988:

The bill rests on the premise that a party who chooses to litigate an issue against the Government is not only representing his or her own vested interest but is also refining and formulating public policy. An adjudica-

tion or civil action provides a concrete, adversarial test of Government regulation and thereby insures the legitimacy and fairness of the law. An adjudication, for example, may show that the policy or factual foundation underlying an agency rule is erroneous or inaccurate, or it may provide a vehicle for developing or announcing more precise rules. The bill thus recognizes that the expense of correcting error on the part of the Government should not rest wholly on the party whose willingness to litigate or adjudicate has helped to define the limits of Federal authority. Where parties are serving a public purpose, it is unfair to ask them to finance through their tax dollars unreasonable Government action and also bear the costs of vindicating their rights.

*See also* H.R.Rep. No. 1418, *supra* note 20, at 18; S.Rep. No. 253, *supra* note 20, at 21, U.S.Code Cong. & Admin.News 1980, at 4997; 126 Cong. Rec. H10,226 (daily ed. Oct. 1, 1980) (statement of Rep. Smith); 125 Cong.Rec. 21,442 (1979) (statement of Sen. McClure); *id.* at 21,435 (statement of Sen. DeConcini); *id.* at 1439 (statement of Sen. DeConcini).

42. *See* S.Rep. No. 253, *supra* note 20, at 6 (explaining that the rule enunciated in *Newman v. Piggie Park Enters.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (per curiam) (prevailing plaintiffs in suits brought under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a (1976), should ordinarily recover their attorneys' fees unless special circumstances would render an award unjust) "is inappropriate in this context because it might have a chilling effect on reasonable Government enforcement efforts"); 126 Cong.Rec. H10,231 (daily ed. Oct. 1, 1980) (statement of Rep. Railsback); 125 Cong.Rec. 21,444–45 (1979) (statement of Sen. Kennedy); *id.* at 21,443 (statement of Sen. Nelson); *id.* at 21,435 (statement of Sen. DeConcini).

automatic fee-shifting provision.[43] Accordingly, it selected an intermediate rule. In the words of the committee reports:

> Under S. 265, fees will be awarded unless the Government can show that its action was substantially justified or that special circumstances make an award unjust. This standard balances the constitutional obligation of the executive branch to see that the laws are faithfully executed against the public interest in encouraging parties to vindicate their rights.

H.R.REP. No. 1418, *supra* note 20, at 10; S.REP. No. 253, *supra* note 20, at 6,[44] U.S. Code Cong. & Admin.News 1980, at 4989.

Which of the two possible interpretations of "the position of the United States" would comport better with the foregoing complex of concerns? To answer that question, we first need to determine when and how it will matter which theory we adopt. Examination of the variety of kinds of controversies covered by the Act reveals that, in the large majority of contexts, it makes no functional difference how one conceives of the government's "position."[45] In actions brought *by* the United States, the governmental action that precipitates the controversy almost invariably *is* its litigation position. Most suits brought *against* the United States entail a similar correspondence. In the usual case, the government acts in a particular fashion and then defends its conduct before an administrative agency and/or a court. Under such circumstances, the litigation position of the United States will almost always be that its

**43.** In the late 1970s, several legislative initiatives seeking to make the United States liable (on some basis) for attorneys' fees when it lost civil cases foundered, substantially because of the legislators' uneasiness at "the high projected cost to the United States" of such a statute. *See* H.R.REP. No. 1418, *supra* note 20, at 6, U.S.Code Cong. & Admin.News 1980, at 4985. Concern over the potentially large financial burden generated by a fee-shifting statute was frequently expressed during the hearings and debates on the bill that ultimately became the EAJA. *See, e.g., Award of Attorneys' Fees Against the Federal Government: Hearings on S. 265 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary,* 96th Cong., 2d Sess. 75, 77, 81–82 (1980) (statement of Mary Derfner, on behalf of the Lawyers' Committee for Civil Rights Under Law and the ACLU); *Equal Access to Justice Act of 1979: Hearings on S. 265 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 96th Cong., 1st Sess. 11–12 (1979) (statement of Michael Hawkins, U.S. Attorney, Dept. of Justice); *id.* at 45, 50–52 (statement of Raymond S. Calamaro, Deputy Asst. Atty. General, Office of Legislative Affairs, Dept. of Justice); *id.* at 166–68 (letter from NLRB Office of the General Counsel, to Chrmn. DeConcini); 126 CONG.REC. H10,223 (daily ed. Oct. 1, 1980) (statement of Rep. Rostenkowski); *id.* at H10,222 (statement of Rep. Danielson); *id.* at H10,221 (statement of Rep. Drinan); 125 CONG.REC. 1439 (1979) (statement of Sen. DeConcini).

**44.** A concise description of the deliberations that resulted in adoption of this intermediate standard is contained in S.REP. No. 253, *supra* note 20, at 2–3. The version of the Act initially considered in the 95th Congress by the Subcommittee on Improvements in Judicial Machinery of the Senate Judiciary Committee provided for a mandatory award of fees whenever the government lost a civil action (unless it sounded in tort). The Justice Department criticized the proposal, on the grounds that "the cost could run as high as $500 million per year," and "a mandatory award would have a 'chilling effect' on proper Government enforcement efforts." *Id.* at 2. The Department proposed instead that fees be awarded if and only if "the governmental action was 'arbitrary, frivolous, unreasonable, or groundless, or . . . the United States continued to litigate after it clearly became so.' " *Id.* The subcommittee rejected the foregoing proposal but, in response to the concerns expressed by the Department, approved an amendment to the bill that eliminated the provision for mandatory awards and "substituted a standard which would allow prevailing parties to recover fees 'unless * * * the position of the United States was substantially justified or * * * special circumstances make an award unjust.' " *Id.* at 3. As explained in the final committee report, "[t]his standard represented an acceptable middle ground between the mandatory award required by S. 2354 as originally drafted and the restrictive standard adopted in the Department of Justice draft proposal." *Id.* *See also* H.R.Rep. No. 1418, *supra* note 20, at 13–14.

**45.** For recognition that the distinction between the theories in most cases is academic, see *Environmental Defense Fund v. Watt,* 554 F.Supp. at 40; *Operating Eng'rs Local Union No. 3 v. Bohn,* 541 F.Supp. at 495; *Citizens Coalition for Block Grant Compliance v. City of Euclid,* 537 F.Supp. at 426.

underlying action was legally justifiable.[46] Only in a minority of cases does it matter whether a court, reviewing a petition for fees brought under the EAJA, looks to the government's original behavior or to its subsequent legal arguments. Assessment of the competing theories, therefore, must be made with reference to those unusual contexts. Relying on our experience, we believe it not unreasonable to assume that most such cases will take one of five forms:

### Example One: Appeals from Agency Actions Under Deferential Standards of Review

The standards by which courts review most kinds of administrative action embody some principle of deference. An agency rulemaking decision, for instance, must be upheld if it contravenes no statutory or constitutional provision, was reached in compliance with pertinent procedural requirements, is supported by substantial evidence, and is not arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2) (1976). A decision by an agency *not* to institute a rulemaking proceeding is accorded even more deference: if the agency adequately explains the facts and policy concerns it relied upon, and if those facts and concerns have some basis in the record, a court will not overturn its judgment. *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C.Cir.1981). To take a more specific example especially germane to the instant case, a decision by the NLRB regarding the appropriate scope of a bargaining unit will not be reversed by a court unless it was "made in excess of [the Board's] delegated powers and contrary to a specific prohibition in the [National Labor Relations] Act." *See Leedom v. Kyne*, 358 U.S. 184, 188, 79 S.Ct. 180, 183, 3 L.Ed.2d 210 (1958); *Boire v. Greyhound Corp.*, 376 U.S. 473, 480–82, 84 S.Ct. 894, 898–99, 11 L.Ed.2d 849 (1964).

When an appellate court, applying one of these deferential standards of review, overturns an agency's decision, how should the agency's liability for attorneys' fees under the EAJA be assessed? Assume, for example, that the promulgation of a novel regulation is held to have been "arbitrary and capricious." If the ensuing EAJA petition submitted by the prevailing private party were evaluated under the "underlying action" theory, the agency's liability for fees would turn upon whether its adoption of the rule was "substantially justified." It is very unlikely that the agency would prevail under such a test; a court that has just concluded that the agency's action was "arbitrary and capricious" would be hard pressed to rule that its action was nevertheless "substantially justified." The net effect would be that the EAJA would become, for all practical purposes, an automatic fee-shifting provision in these circumstances.[47] That result seems plainly inconsistent with Congress' general objective in enacting section 2412(d)(1)(A): to establish an "intermediate" standard for the allocation of attorneys' fees, one falling somewhere between the English Rule and the current American Rule.[48] More consistent with the purposes of the Act would be a rule whereby a court, when reviewing an

---

**46.** Thus, for example, the Secretary of Health and Human Services frequently denies disability benefits; when such a denial is challenged before a district court, the Secretary argues that his ruling was consistent with the law. Similarly, the Internal Revenue Service often denies applications for refunds; when challenged in court, the agency asserts the legal basis for its decisions. The Federal Energy Regulatory Commission is frequently called upon to interpret contracts pertaining to the wholesale purchase of electrical power; in litigation brought by adversely affected parties, the Commission usually argues that its decisions complied with its enabling act and its own regulations.

**47.** It is perhaps conceivable that courts could develop a definition of "substantially justified" that would make it possible for them coherently to conclude, in some cases, that "arbitrary and capricious" conduct was nevertheless "substantially justified." However, the net result of such a doctrinal development would almost certainly be trivialization of the adjective "substantial," which would clearly be inconsistent with Congress' intent in enacting the EAJA. *See* text at notes 66–67 *infra*.

**48.** *See* note 44 *supra* and accompanying text.

EAJA petition arising out of a case of the sort described above, would ask: Was the agency's litigation position (*i.e.*, its argument on appeal that its promulgation of the regulation was not arbitrary and capricious) substantially justified? [49]

### Example Two: Standards of Liability Linked to the Justification for Conduct

The government's liability, in several kinds of suits, turns upon its ability to offer a reasonable justification for its own or its officials' behavior. The category that springs most readily to mind are suits brought against the United States under the Eighth Amendment [50] alleging that conditions in federal prisons constitute "cruel and unusual punishment." Though the standard of liability governing such actions remains somewhat in flux, a crucial element in almost all modern formulations of the test is the absence of a defensible rationale for the conditions at issue. Thus, the Supreme Court recently summarized the governing law as follows:

> Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," or are grossly disproportionate to the severity of the crime. Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification."

*Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981) (citations and footnote omitted). Clearly, a prerequisite to a finding of a constitutional violation, under the foregoing standard, is a determination that the prison conditions in question are not "substantially justified." [51]

The close parallel between the standard of liability, in suits of this sort, and the criterion for the award of attorneys' fees under the EAJA gives rise to a set of problems similar to those discussed in the preceding example. If, when evaluating an EAJA petition brought by a plaintiff (or class of plaintiffs) who prevailed in a case of the kind just described, the judge focused on the justification for the government's "underlying action," he or she would find it virtually impossible to deny the plaintiff(s) attorneys' fees. The net result would be that the EAJA would again become something approaching an automatic fee-shifting provision for a significant category of cases. As indicated above, this seems not to have been contemplated by the congressmen who enacted the statute.[52]

---

**49.** *See Grand Boulevard Improvement Ass'n v. City of Chicago,* 553 F.Supp. at 1162; *Operating Eng'rs Local Union No. 3 v. Bohn,* 541 F.Supp. at 495 (both opinions adopting the "litigation position" theory for substantially the reasons stated in this section of the text).

**50.** We assume, for the sake of simplicity, that such suits seek only declaratory and injunctive relief and are brought only against officials of the United States acting in their official capacity. It is clear that the EAJA applies to such actions. *See* 28 U.S.C. § 2412(d)(2)(C) (Supp. V 1981).

**51.** Another example of a kind of suit in which the standard of liability is linked to the justification for governmental conduct is an action alleging that federal law enforcement officers conducted a warrantless search and seizure unjustified by "exigent circumstances" in violation of the Fourth Amendment. For discussions of the complex and as yet unresolved question of the extent to which the United States may be held liable in damages (under the Federal Tort Claims Act, 28 U.S.C. § 2680(h) (1976)) in situations of this general sort, *see Carlson v. Green,* 446 U.S. 14, 19–20, 23, 100 S.Ct. 1468, 1471–1472, 1474, 64 L.Ed.2d 15 (1980) (dicta); *Birnbaum v. United States,* 588 F.2d 319, 327–28 (2d Cir.1978).

**52.** We need not consider here the possibility that § 2412(*b*) of the EAJA has the effect of making the United States automatically liable for attorneys' fees when it loses a suit seeking to vindicate a constitutional right, on the ground that a *state* or its official would ordinarily be so liable, under 42 U.S.C. § 1988 (Supp. V 1981), in an analogous suit brought under 42 U.S.C. § 1983 (Supp. V 1981). *See Lauritzen v. Secretary of the Navy,* 546 F.Supp. at 1227–29 & n. 10. Whatever Congress may have achieved (intentionally or unintentionally) in § 2412(*b*) by making the United States liable for fees "to the same extent that any other party would be liable ... under the terms of any statute which specifically provides for such an award," it seems clear that Congress did not intend, when it adopted the "substantially justified" standard embodied in § 2412(d)(1)(A), in effect to bring the United

Thus, in this context as well, it seems preferable for the court to attend to the strength of the arguments advanced by the government in support of its denial of liability, rather than to the justification for the behavior itself.[53]

### Example Three: Defenses Unrelated to the Merits of the Government's Behavior

When civil actions are brought against the United States, it is sometimes able to resist on the basis of defenses unrelated to the merits of the underlying actions of its officials. For example, if, as a result of a change in the government's own position or of unrelated events, the potential for impairment of a plaintiff's interests has been reduced, the government may be able to argue that the case is moot. Or, if the plaintiff delayed bringing suit, the government may be able to rely on a statute of limitations or the doctrine of laches.[54] Each of these defenses is founded on important policy considerations. For example, the mootness doctrine reduces the likelihood that courts will decide cases unaided by the kind of thorough adversarial scrutiny of the relevant issues that only a genuine contro-

versy between the parties can create.[55] Statutes of limitation and the laches doctrine promote repose and encourage aggrieved persons to bring suits while evidence is still fresh and reliable.

The choice between the "underlying action" and "litigation position" theories will significantly affect the government's willingness to assert viable defenses of this sort. An example might be the situation of a government attorney who must decide whether to contest a moderately stale suit against the United States. Because of the passage of time, he may be able to collect only scant evidence to dispute the plaintiff's allegations, but he may nevertheless have a colorable (but not "sure-fire") laches defense. If the governing interpretation of "the position of the United States," within the meaning of the EAJA, were the government's "underlying action," the attorney might well decide not to contest the suit (*i.e.,* not to assert the laches argument). He would realize that, if he did not prevail, the government would automatically be liable, not only for the value of the claim, but also for the plaintiff's attorneys' fees (because government counsel would be unable, at this late date, to show that the original

---

States within the coverage of the Civil Rights Attorney's Fees Awards Act, *see* note 16 *supra* and accompanying text.

**53.** To illustrate the difference between the theories in practice, consider the following case: a prisoner challenges as violative of the Eighth Amendment a novel system adopted by a federal penitentiary for classifying and segregating inmates, whereby those convicted of specific crimes (all involving unprovoked personal violence) are confined together in a separate, unusually uncomfortable facility. The prison officials defend the system on the ground that it is necessary to protect weaker inmates from violence and sexual assault. The court rejects the officials' argument, rules that the system entails "the unnecessary and wanton infliction of pain," *Rhodes v. Chapman,* 452 U.S. at 346, 101 S.Ct. at 2398, and orders that the classification procedures be changed. The court's ruling on the merits of the case would seem to dictate a finding that the government's "underlying action" was not "substantially justified," and a consequent award of attorneys' fees to the prevailing parties. By contrast, were the court's attention focused on the argument advanced in litigation by the prison officials, it might well

conclude that, the issue being one of first impression, the defendants' position was "substantially justified." Whatever one thinks of the desirability of these two possible outcomes, it seems clear that the latter is more consistent with the objectives of the EAJA. The officials' adoption of (and willingness to defend in court) their new system is precisely the kind of legitimate effort by the executive to comply with or enforce the law that Congress wished not to chill. *See* text at note 42 *supra.*

**54.** Other examples: if the plaintiff has not explored alternative avenues of relief, the government may defend on the ground that he has not exhausted his administrative remedies; if the plaintiff lacks a significant stake in the outcome of the dispute, the government may argue that he does not have standing to bring the suit.

**55.** The mootness doctrine also, of course, has a constitutional underpinning (which itself has been explained partly on the basis of the policy consideration described in the text). *See Powell v. McCormack,* 395 U.S. 486, 496 & n. 7, 89 S.Ct. 1944, 1950 & n. 7, 23 L.Ed.2d 491 (1969); *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968).

behavior by the alleged perpetrators of the plaintiff's harm was substantially justified).

In sum, tying EAJA awards to the strength of the justification for the government's original action would discourage counsel for the government from asserting defenses unrelated to its officials' conduct that have a significant chance of prevailing. Such an outcome seems both unfortunate, from a policy standpoint, and inconsistent with Congress' desire not to chill legitimate efforts by the executive to enforce the law. Thus, here again, it seems more sensible for courts, when reviewing EAJA petitions, to attend to the strength of the legal arguments advanced on behalf of the United States.[56]

### Example Four: Supervening Change in the Law

Frequently, during the time in which a suit brought against (or by) the United States is pending, the pertinent legal rules are altered in a manner adverse to the government.[56] The effect of such a change often is that, while the government's action was "substantially justified" when originally undertaken, persistence in defending that action in court is unjustifiable. In such a situation, if counsel for the United States stubbornly continues litigating the case, compelling the private party to incur attorneys' fees before eventually prevailing, it seems clear that the objectives underlying the EAJA would be served by shifting those costs to the government. Application of the "underlying action" theory would not

have that effect; application of the "litigation position" theory would.

### Example Five: Surrender by the Government

Assume that a government contractor believes that the United States has failed to abide by the terms of an agreement (*e.g.*, has misapplied a provision designed to adjust contract prices to accord with inflation). The contractor hires a lawyer who (without consulting the government contracting officer) conducts an investigation and then drafts and files a civil complaint. The government's attorney, upon receiving the complaint, conducts his own inquiry and concludes that the claim is meritorious. (*E.g.*, he finds that, though the government's error was inadvertent, it nevertheless constituted a clear violation of the terms of the contract.) The government attorney informs the responsible official of his findings, who pays the plaintiff the money to which he is legally entitled. The plaintiff then brings a second action, under the EAJA, to recover his attorneys' fees. If the petition is evaluated under the "underlying action" theory, the contractor will prevail. (Even though the government never took a litigation position hostile to the plaintiff, the plaintiff will qualify as a "prevailing party," and the conduct that gave rise to the suit will fail the "substantial justification" test.)[57] If it is assessed on the basis of the "litigation position" theory, the contractor will lose.[58]

---

56. The most common change of this kind is a revision or clarification of judicial interpretation of the constraints imposed on an agency's discretionary authority by its enabling act.

57. *Cf. Environmental Defense Fund v. Watt*, 554 F.Supp. at 41 (Applying the "underlying action" theory to a case in which the government abandoned the practice challenged by the plaintiffs and entered into settlement negotiations very soon after the filing of the complaint, the court concluded that the government had failed to demonstrate that its original behavior was substantially justified and ordered it to pay attorneys' fees.).

58. *Cf. Operating Eng'rs Local Union No. 3 v. Bohn*, 541 F.Supp. at 495–96 (Applying the "litigation position" theory to a case in which

the government capitulated within nine days of its receipt of the complaint, the court concluded that the government's position was "substantially justified" and accordingly denied attorneys' fees under the EAJA.).

It seems clear that, if the government does not immediately accede to the plaintiff's demand, but instead initially opposes his claims and then at some later stage (*e.g.*, in a pre-trial settlement) surrenders, the United States will be liable for attorneys' fees regardless of which theory is applied. Under such circumstances, not only will government have acted unreasonably, but it will have adopted (at least briefly) a litigation position lacking substantial justification. For strong indications of Congress' intent that fees be awarded under these circumstances, see H.R.REP. No. 1418, *supra* note 20, at 11;

It is not immediately obvious which of the foregoing results is preferable. In favor of the first option, it could be argued that the prospect of being compelled to pay attorneys' fees in such situations would make government administrators more careful and (perhaps more importantly) would reduce the incidence of less innocent "mistakes."[59] In favor of the second option, it could be argued that routine payment of attorneys' fees under these circumstances would only foster collusion between lawyers and putative victims of governmental errors and would result in unnecessary expenditures of public funds. Most such disputes can be resolved quickly and easily through informal discussion between the aggrieved party and the responsible government official. Awarding attorneys' fees to private parties who, instead of availing themselves of such avenues of relief, file civil complaints would simply result in unnecessary—and unnecessarily costly—formalization of the processes whereby the competing interests of state and citizen are clarified and accommodated. Though the issue is not clear-cut, we think that, on balance, the latter considerations are the more compelling, in view of the purposes of the Act as a whole. Accordingly, the "litigation position" theory seems preferable in this context as well.[60]

To summarize, in each of the five contexts we can imagine in which the definition of "the position of the United States" would make a difference, it seems more sensible and consistent with the purposes of the EAJA to interpret the phrase as the stance taken by the United States in litigation than to interpret it as the governmental behavior that precipitated the suit.

One potential objection remains to be considered: it might be argued that our analysis has been flawed by our reliance on a false dichotomy. Why not award fees if *either* the government's litigation position or its underlying action was not substantially justified? Review of the scenarios described above, however, reveals the emptiness of this argument. Of the five situations we examined, only one—the supervening change in the law[61]—could be handled sensibly through application of the suggested alternative definition of "position of the United States."

Finally, we note that exclusive use of the "litigation position" theory would have one important incidental advantage: it would permit and encourage courts to award to prevailing private parties the fees they incurred in combatting unreasonable arguments advanced by the government, while denying fees incurred in defeating substantial arguments.[62] Such a practice, if it be-

S.Rep. No. 253, *supra* note 20, at 7. *But see Alspach v. District Director of Internal Revenue,* 527 F.Supp. at 229 (finding the litigation position of the IRS to have been "substantially justified" when it initially resisted a clearly meritorious suit to enjoin it from collecting a tax, but surrendered one month after it had located and reviewed the taxpayers' file). The *only question open to serious dispute is whether the government should be obliged to pay fees when it surrenders at the very outset of litigation.*

**59.** The net effect would be promotion of one of the objectives underlying the EAJA—reduction of the incidence of abusive governmental action. *See* text at note 40 *supra*.

**60.** A further reason for not interpreting the EAJA to require awards of fees in circumstances of this sort is that such a rule would likely result in significant waste of judicial resources. Whenever the government capitulated at the outset of litigation and the victorious private party submitted a request for fees under the EAJA, the court that received the petition would be obliged to conduct a full-scale hearing on the merits in order to assess the strength of the justification for the government's original action. (Indeed, if government counsel were aware that such hearings would likely be necessary, they would be significantly less inclined to capitulate in the first place, figuring that they might as well contest the merits of the claim if they were forced to contest the government's liability for fees.) It seems unlikely that Congress intended (or would have wanted) the Act to spawn otherwise unnecessary proceedings of this kind.

**61.** *See* text at note 56 *supra*.

**62.** *Cf. Goldhaber v. Foley,* 698 F.2d 193, 197 (3d Cir.1983) (holding that the Act must be interpreted so as "to charge the United States with that portion of the expenses attributable to its unjustifiable positions" (footnote omitted)).

came widespread, would induce government counsel to evaluate carefully each of the various claims they might make in a particular controversy, and to assert only those that are substantially justified. The net result would be more sensitive and effectual promotion of the objectives of the EAJA.

For the foregoing reasons, we hold that "the position of the United States," for the purposes of the Act, means the arguments relied upon by the government in litigation.

## C. *"Substantially Justified"*

The second of the two phrases whose meaning is crucial to the case at bar is "substantially justified." Only by showing that "the position of the United States" (as we have now defined it) satisfied this standard can the government avoid liability for attorneys' fees.

Fortunately, the legislative history of the Act casts considerable light on the meaning of this phrase. For example, the committee reports definitively resolve the potentially troublesome question of how burdens of proof are to be allocated: once the private party has shown that he "prevailed" in the litigation,[63] the government bears the burden of demonstrating that its position was "substantially justified."[64] This principle thus far has been consistently recognized by the courts.[65]

It is somewhat more difficult to determine what exactly Congress intended the government should be required to prove, but much insight can be gleaned from the following passages of legislative history:

> The test of whether or not a Government action is substantially justified is essentially one of reasonableness. Where the Government can show that its case had a reasonable basis both in law and fact, no award will be made. . . .
>
> Certain types of case dispositions may indicate that the Government action was not substantially justified. A court should look closely at cases, for example, where there has been a judgment on the pleadings or where there is a directed verdict or where a prior suit on the same claim had been dismissed. Such cases clearly raise the possibility that the Government was unreasonable in pursuing the litigation.
>
> The standard, however, should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a substantial probability of prevailing.

H.R.Rep. No. 1418, *supra* note 20, at 10–11; S.Rep. No. 253, *supra* note 20, at 6–7, U.S. Code Cong. & Admin.News 1980, at 4989.[66]

---

**63.** Because there is no question, in the instant case, that the appellants qualified as "prevailing parties," we do not pursue the meaning of that statutory requirement. For efforts to explicate the phrase, see, *e.g.,* H.R.Rep. No. 1418, *supra* note 20, at 11–12; S.Rep. No. 253, *supra* note 20, at 7; H.R.Rep. No. 1434, *supra* note 20, at 21–22; *United States ex rel. Heydt v. Citizens State Bank,* 668 F.2d 444, 447 (8th Cir. 1982).

**64.** H.R.Rep. No. 1418, *supra* note 20, at 10–11, 18; S.Rep. No. 253, *supra* note 20, at 6, 21.

**65.** *See, e.g., S & H Riggers & Erectors, Inc. v. OSHRC,* 672 F.2d at 430; *United States ex rel. Heydt v. Citizens State Bank,* 668 F.2d at 447.

**66.** For judicial efforts to apply these formulae to particular sets of facts, see *Gava v. United States,* 699 F.2d at 1370–71; *Tyler Business*

*Servs. v. NLRB,* 695 F.2d at 75–76; *Broad Ave. Laundry & Tailoring v. United States,* 693 F.2d at 1391–92; *S & H Riggers & Erectors, Inc. v. OSHRC,* 672 F.2d at 430–31; *United States ex rel. Heydt v. Citizens State Bank,* 668 F.2d at 447–48; *NAACP v. Donovan,* 554 F.Supp. 715, 717 (D.D.C.1982); *Boudin v. Thomas,* 554 F.Supp. at 705–07; *Grand Boulevard Improvement Ass'n v. City of Chicago,* 553 F.Supp. at 1161–66; *Cornella v. Schweiker,* 553 F.Supp. at 243–45; *Hornal v. Schweiker,* 551 F.Supp. 612, 617–18 (M.D.Tenn.1982); *McDonald v. Schweiker,* 551 F.Supp. 327, 332–33 (N.D.Ind. 1982); *Ellis v. United States,* 550 F.Supp. 674, 676–80 (Cl.Ct.1982); *Ulrich v. Schweiker,* 548 F.Supp. 63, 65–66 (D.Idaho 1982); *Bennett v. Schweiker,* 543 F.Supp. 897, 898–99 (D.D.C. 1982); *Nunes-Correia v. Haig,* 543 F.Supp. at 817–19; *Kennedy v. United States,* 542 F.Supp. 1046, 1047–48 (D.N.H.1982); *Wolverton v. Schweiker,* 533 F.Supp. at 424–25; *Berman v. Schweiker,* 531 F.Supp. at 1153–54.

Analysis of one other aspect of the legislative history enables us to refine the standards suggested above. The Senate Judiciary Committee considered and rejected an amendment to the bill that would have changed the pertinent language from "substantially justified" to "reasonably justified." S.REP. No. 253, *supra* note 20, at 8. That refusal suggests that the test should, in fact, be slightly more stringent than "one of reasonableness." [67]

The foregoing generalizations regarding the requisite strength of the government's case should enable courts to dispose of most EAJA petitions. Borderline cases, however, can be fairly resolved only through the application of more particularized criteria. For guidance in developing such guidelines, we must refer once again to the objectives underlying the Act as a whole.[68] Such an inquiry makes possible the identification and elaboration of several useful principles.

■ To begin with, it seems clear that the purposes of the Act would *not* be promoted by treating the question whether the position taken by the United States in a particular case was "substantially justified" as equivalent to the question whether it was "reasonable" for government counsel to pursue the litigation. To be more specific, it would be improper for a court, when evaluating an EAJA petition, to take into account either of two circumstances that might make the decision of the government's attorney to pursue a very weak case appear "justifiable."

First, the government's lawyer might have been bound by bureaucratic constraints. For example, his office might have exclusive authority to represent the United States in a particular kind of suit, and departmental policy might require defense, on appeal, of all favorable decisions rendered in adversary adjudication. Such constraints, though they may excuse the conduct of individual attorneys, are precisely what the EAJA was designed to change.[69] Awards of attorneys' fees in such circumstances would have a salutary effect: agencies that at present adhere to such policies likely would alter their rules in ways designed to promote more careful evaluation of the merits of individual cases.[70]

Second, the importance of a legal issue may justify a decision by government counsel to "take a long shot"—for example, to argue on appeal for the overruling of a controlling precedent unfavorable to the United States, even though the likelihood of obtaining such a judgment is slight. Several considerations suggest that, when the government loses such a case, it should be obliged to reimburse the private party for his attorneys' fees. To begin with, in controversies of this sort, it is especially important that the private litigant not be deterred, by the prospect of high litigation expenses, from defending his interests; only if they are subjected to vigorous adversarial testing will such important issues receive the attention they deserve. That concern is reinforced by consideration of the causes and implications of the rarity with which such cases arise. Suits of this kind are often "test cases"; the government has decided that, though hitherto it routinely abided by the dictates of the controlling precedent, the time has come to venture a challenge to the rule. The result is that the private party, through no fault of his own, is forced to expend an unusually large amount of time and effort defending his claims. The value of periodic reexamination of legal norms may make us willing to tolerate the resultant inequity, but it is difficult to justify forcing the private party, who has been randomly selected by the

---

67. *See NRDC v. EPA,* 703 F.2d at 721 n. 7 (Hunter, J., dissenting); *Ulrich v. Schweiker,* 548 F.Supp. at 65; *Nunes-Correia v. Haig,* 543 F.Supp. at 817; *Wolverton v. Schweiker,* 533 F.Supp. at 424.

68. *See* text at notes 38–43 *supra.*

69. *See* note 40 *supra* and accompanying text.

70. For somewhat ambiguous discussions of this general problem, see *Kay Mfg. Co. v. United States,* 699 F.2d at 1383 (Nichols, J., dissenting); *Gava v. United States,* 699 F.2d at 1372–74 (Nichols, J., concurring).

government to be the target of its test case, to pay the large cost of litigating the issue if he ultimately prevails. In short, this is precisely the sort of situation in which the public at large, not the individual litigant, should pay the cost of "refining the administration of the law." [71] Finally, there is no good reason to suppose that fee-shifting under these circumstances will deter the *government* from bringing such test cases. If the issue is important enough, government officials, who of course are not personally liable for the payment of fees, should not be dissuaded by the prospect of an award of fees to a private party's counsel. And in those rare instances when government officials are dissuaded from challenging established law, we cannot assume that the result would be inconsistent with Congress' purposes in enacting the EAJA.[72]

What factors, then, are appropriately considered by a court deciding a hard case? Reference to the complex of statutory objectives described above [73] suggests the following three criteria. This list is not intended to be exhaustive, but attention to these matters seems likely to advance Congress' stated ends.

### (1) Clarity of the Governing Law

The reasons for the relevance of this first factor are implicit in the foregoing discussion. For the purposes of the EAJA, the more clearly established are the governing norms, and the more clearly they dictate a result in favor of the private litigant, the less "justified" it is for the government to pursue or persist in litigation. The government is always free, of course, to seek modification or repudiation of established doctrine, but individual private litigants should not be compelled to subsidize such reevaluations of controlling doctrine. In sum, a court assessing an EAJA petition should attend to the strength of the government's argument(s) that *extant* law permits a result in its favor, not to the strength (or probability of success) of its argument(s) that the law should be changed.[74]

71. *See* text at note 41 *supra.*

72. There may be unusual circumstances in which neither the purposes of the Act nor considerations of equity would be promoted by awarding fees when the government has taken such a "long shot" and lost. Fortunately, the Act contains a "safety valve" for accommodation of situations of just this sort: § 2412(d)(1)(A) allows the court to decline to award fees if it finds that "special circumstances make an award unjust." The legislative history indicates that one of the kinds of cases this proviso was designed to accommodate is that in which the government "in good faith [advances] the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts." H.R.Rep. No. 1418, *supra* note 20, at 11; S.Rep. No. 253, *supra* note 20, at 7, U.S.Code Cong. & Admin. News 1980, at 4990. *Cf. Midwest Research Inst. v. United States,* 554 F.Supp. 1379, 1391–92 (W.D.Mo.1983) (relying on the "safety valve" provision to deny attorneys' fees in precisely this kind of situation); *Nunes-Correia v. Haig,* 543 F.Supp. at 820 (refusing to open the valve when the government's legal arguments, though "untested," were not "worthy of credit"). Though the congressional committees pointedly did *not* refer to good faith efforts to secure changes in *existing* interpretations of the law, there may be circumstances in which the reasons for not awarding fees when the government advocates "novel extensions" are applicable when it seeks revisions of governing norms.

The provision of the EAJA to which the question of the "reasonableness" of the behavior of government counsel *is* relevant is § 2412(b). In determining whether fees should be awarded against the United States under the "bad faith" exception to the American Rule, *see* notes 19–20 *supra* and accompanying text, a court must assess the justifiability of the government attorney's decision to press forward in litigation. In so doing, the court should take into account such factors as the existence of institutional constraints on the attorney's conduct and the importance of the issue at stake in the case.

73. *See* text at notes 38–43 *supra.*

74. *Cf. Kay Mfg. Co. v. United States,* 699 F.2d at 1379 ("Justification for the government's position at trial and on appeal must be measured against the law as it existed when the government was litigating the case, not against new law enunciated by the Court of Claims as a result of the appeal."); *Broad Ave. Laundry & Tailoring v. United States,* 693 F.2d at 1392 ("On the basis of the law as it stood after the Board decision, it was far from clear that the Board's decision was erroneous or that the Court of Claims would reverse it. In those circumstances, it was reasonable [*i.e.,* "sub-

### (2) Foreseeable Length and Complexity of the Litigation

The longer and more complex the course of litigation necessary to vindicate his position, the more hesitant a private party will be to defend his interests, even if an eventual finding that the government's position was not substantially justified would result in reimbursement of his costs of counsel. The rational litigant will realize that, the more protracted the proceeding, the more he stands to lose if *either* he does not prevail on the merits or his petition for fees is denied, while the money he stands to gain (or the point of principle he hopes to make) remains constant. Sensitivity to the central objective of the Act—reduction of the deterrents to challenges of unreasonable government conduct—thus suggests that, in categories of cases in which substantial investments of effort and money commonly are required to prosecute suits to their ultimate conclusions, the government should be obliged to make an especially strong show-

ing that its persistence in litigation was justified.[75]

### (3) Consistency of the Government's Position

A problem frequently cited by congressional proponents of the EAJA was the capacity of the government with impunity to "single out" particular private parties. Too often, they believed, agencies and officials adopt a general policy in dealing with cases of a given variety but take a different position (inexplicably or maliciously) in one or a few cases. One of the systemic sources of inequity advocates of the Act sought to eliminate was the ability of the government to use its superior resources to beat into submission the hapless victims of such deviations from customary practices.[76] The relevance of inconsistency of this kind to the EAJA calculus becomes even more apparent when one recalls the two "public policy" objectives underlying the Act;[77] awarding attorneys' fees to private parties who suc-

stantially justified"] for the United States to defend the Board's decision before the Court of Claims."); *Donovan v. Dillingham,* 668 F.2d 1196, 1199 (11th Cir.1982) (finding the position of the United States to have been substantially justified because, both at the time it initially brought suit and at the time it appealed the adverse ruling by the district court, the governing law (for different reasons) was unsettled), *rev'd on other grounds,* 688 F.2d 1367 (11th Cir.1982) (en banc); *Underwood v. Pierce,* 547 F.Supp. 256, 261–62 (C.D.Cal.1982) (finding the position of HUD not to have been substantially justified, largely on the ground that at the time the position was taken, nine courts had rejected the argument, although the Supreme Court had granted certiorari in two related cases). *But cf. Wyandotte Sav. Bank v. NLRB,* 682 F.2d 119, 120 (6th Cir.1982) (per curiam) (holding that the NLRB was "substantially justified" in seeking the overruling of a controlling, ten-year-old Sixth Circuit precedent (which had been rejected by two other circuits), reasoning that "the position taken by the Board was a reasonable attempt to reopen a closed question").

**75.** There is clear support in the legislative history for reliance upon this factor in one context. The committee reports observe that "[s]ubsection 2412(d)(3) provides that a court may award fees to a party who prevails upon judicial review of an adversary adjudication," then goes on to argue that, "[i]n these cases in

particular, where a party has had to engage in lengthy administrative proceedings before final vindication of his or her rights in the courts, the government should have to make a strong showing to demonstrate that its action was reasonable." H.R.Rep. No. 1418, *supra* note 20, at 18; S.Rep. No. 253, *supra* note 20, at 21, U.S.Code Cong. & Admin.News 1980, at 4997. Our own discussion represents nothing more than a generalization of the principle implicit in the committees' comment.

**76.** The scenario of this sort most often described in the legislative history is that of agency officials concentrating their enforcement efforts on small businessmen who lack the money and legal advice necessary effectively to resist. *See, e.g.,* H.R.Rep. No. 1418, *supra* note 20, at 10; S.Rep. No. 253, *supra* note 20, at 5 & n. 1; 126 Cong.Rec. H10,226 (daily ed. Oct. 1, 1980) (statement of Rep. Smith); *id.* at H10,220 (statement of Rep. Pickle); 125 Cong.Rec. 21,442–43 (1979) (statement of Sen. Nelson); *id.* at 1439 (statement of Sen. DeConcini).

Not only are such cases distressing from an equitable standpoint, but they may have devastating effects on the fortunes of the victims. Many of the potential beneficiaries of the EAJA are small proprietors operating in highly competitive markets. Subjection to *unusually* harsh treatment by regulatory authorities can be catastrophic to such persons.

**77.** *See* text at notes 40–41 *supra.*

cessfully challenge governmental departures from established policy would both foster the "refinement" of the administration of the law and provide a valuable deterrent to officials contemplating making gratuitous exceptions to general rules. In sum, a court reviewing an EAJA petition should demand that the government make a particularly strong showing of justification for its position when there is evidence that the petitioner was subjected to *atypically* harsh treatment.[78]

We acknowledge that our holding that the court should take into account whether the government, in its treatment of the plaintiff, departed from established policy stands in some tension with our holding that "the position of the United States" means the government's *litigation* position, not its underlying action.[79] Our willingness to tolerate that tension derives from our belief that both holdings are required in order most effectually to promote the un-

derlying objectives of the Act. To clarify our position: when the government *acts* inconsistently, and subsequently loses a civil suit challenging its behavior, it should be obliged to make an especially strong showing that its *legal arguments* were substantially justified in order to avoid liability for fees under the EAJA.

### D. *The Standard of Appellate Review*

█ Our task in this case is not to determine *de novo* the appellants' entitlement to attorneys' fees; it is to review the District Court's denial of their petition. Disposition of the appeal thus requires that we define the standard by which trial judges' rulings on EAJA applications should be evaluated by courts of appeals.

The case law affords us little aid in deciding this issue; to date, no circuit has seriously addressed the question of the proper standard of review.[80] And, unfortunately,

---

**78.** *Cf. Hoang Ha v. Schweiker,* 541 F.Supp. 711, 713 (N.D.Cal.1982) (emphasizing the fact that "the position of the federal defendant was inconsistent with the practice of his own agency" in support of a finding that that position was not substantially justified), *rev'd,* 707 F.2d 1104 (9th Cir.1983).

**79.** *See* Part II.B.2. *supra.*

**80.** Several recent appellate opinions contain suggestions or assumptions regarding the standard of review that should apply to cases of this sort. Unfortunately, not only are those various proposals inconsistent with one another, but none is sufficiently well reasoned to be capable of providing us much guidance.

The earliest of these suggestions appears in *Knights of the Ku Klux Klan v. East Baton Rouge Parish School Bd.,* 679 F.2d 64 (5th Cir. Unit A 1982). In remanding a case to district court for reconsideration, in light of the Act, of a prevailing party's entitlement to attorneys' fees, the Fifth Circuit there opined that "the basic role of this Court is merely to review a fee award or denial of an award under the EAJA, modifying it only if the failure to make the award, or the calculation of the amount of the award, was an abuse of discretion." *Id.* at 68–69. It seems clear, however, that the issue of the proper standard of review had not been briefed, and resolution of the question certainly was not essential to the court's decision.

In *Goldhaber v. Foley,* 698 F.2d at 197–98, the Third Circuit reversed a trial judge's ruling denying attorneys' fees under the Act, on the ground that the judge had adopted an improp-

erly restrictive definition of "the position of the United States." In so doing, the court seemed to take for granted that the trial judge's conclusions regarding the correct meaning of the EAJA itself were subject to *de novo* review. The court did not, however, rule on the question whether the plaintiffs were entitled to fees, but instead remanded the case for determination of whether they qualified as "prevailing parties" and whether the government's position had been "substantially justified," *id.* at 198; the court gave no indication of the standard by which it would (if called upon) review the judge's rulings on remand.

In two recent decisions, the new Federal Circuit reversed decisions by judges of the Claims Court granting attorneys' fees under the Act. *Kay Mfg. Co. v. United States,* 699 F.2d 1376 (Fed.Cir.1983); *Gava v. United States,* 699 F.2d 1367 (Fed.Cir.1983). In neither instance did the court specify the standard by which it was reviewing the decision below, but it appears to have conducted a *de novo* assessment of the strength of the legal arguments advanced in each case by the government. *See, e.g., Gava v. United States,* 699 F.2d at 1370 ("We cannot agree with the trial judge that the government's position in litigating this case before the Court of Claims was not substantially justified."). The relevance to the instant case of these two decisions is mitigated, however, by the fact that, in a wide variety of contexts, the Federal Circuit remains prone to engage in the kind of searching reexamination of questions decided by trial judges that it used to conduct in its former avatar as the appellate division of

the likely repositories of evidence of legislative intent prove empty. The statute itself contains no hint as to the proper standard,[81] and the legislative history is barren of reflection on the issue.

Some insight might be gained from a study of the standards appellate courts have developed for reviewing trial judges' rulings on other issues that frequently arise in attorneys' fees cases. Unfortunately for our purposes, those standards vary considerably. Examples include: the deferential "abuse of discretion" standard by which district court determinations regarding the appropriate *amount* of attorneys' fees are examined;[82] the much closer scrutiny generally accorded lower court findings concerning whether litigants qualify as "prevailing parties";[83] and the distinctive crite-

the Court of Claims. *See, e.g., Baginsky v. United States,* 697 F.2d 1070 (Fed.Cir.1983).

Finally, in two cases decided in the last two months, the Ninth Circuit devoted only cursory attention to the question of the proper standard of review. In *Foster v. Tourtellotte,* 704 F.2d 1109, 1110–11 (9th Cir.1983), "[t]he parties agree[d] that the basic standard to be applied to a denial of attorney's fees is the abuse of discretion standard," and the court (citing *KKK v. Baton Rouge School Bd., supra,* and misciting H.R.Rep. No. 1434, *supra* note 20) declined to subject that agreement to critical scrutiny. In *Hoang Ha v. Schweiker,* 707 F.2d 1104 (9th Cir.1983), the court simply cited *Foster v. Tourtellotte,* without comment, in holding that an award of attorney's fees under the EAJA is reviewed under the abuse of discretion standard.

**81.** The Act does establish a special procedure for appellate review of decisions by *administrative agencies,* under 5 U.S.C. § 504(a)(1) (Supp. V 1981), denying attorneys' fees to parties who have prevailed in adversary adjudication before them. 5 U.S.C. § 504(c)(2) (Supp. V 1981) provides that:

A party dissatisfied with the fee determination made under subsection (a) may petition for leave to appeal to the court of the United States having jurisdiction to review the merits of the underlying decision of the agency adversary adjudication. If the court denies the petition for leave to appeal, no appeal may be taken from the denial. If the court grants the petition, it may modify the determination only if it finds that the failure to make an award, or the calculation of the amount of the award, was an abuse of discretion.

Two considerations counsel against transplanting the foregoing procedure and standard into the context of appellate review of district court decisions under 28 U.S.C. § 2412(d)(1)(A). First, the inclusion of this unusual system for appellate review in the portion of the EAJA pertaining to decisions by agencies and not in the portion of the Act dealing with decisions by courts strongly suggests that Congress believed that *only* decisions of the former sort were deserving of this kind of special treatment. Second, it appears that Congress contemplated that administration of the EAJA would and

should vary, to some extent, between different agencies. Thus, the section of the Act immediately preceding that dealing with judicial review of adverse agency determinations provides that: "After consultation with the Chairman of the Administrative Conference of the United States, each agency shall by rule establish uniform procedures for the submission and consideration of applications for an award of fees and other expenses." 5 U.S.C. § 504(c)(1) (Supp. V 1981). The assumptions that seem to underlie the foregoing provision are (i) that the circumstances under which fees should be awarded in adversary adjudications will depend to some degree on the nature of the substantive issues at stake and the distinctive features of the processes by which they are considered, and (ii) that, consequently, each agency should establish its own rules for handling requests for such fees. The same assumptions could account for Congress' decision to allow reversal of agency determinations only for abuse of discretion. Clearly, the same considerations do not apply to appellate review of district court rulings under the Act.

**82.** *See, e.g., Copeland v. Marshall,* 641 F.2d 880, 901 (D.C.Cir.1980) (en banc); *Pete v. United Mine Workers of America Welfare & Retirement Fund of 1950,* 517 F.2d 1275, 1289 (D.C. Cir.1975) (en banc). The recent decision by the Supreme Court in *Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), construing the Civil Rights Attorney's Fees Awards Act, *see* note 16 *supra* and accompanying text, reaffirms this general principle but holds that, particularly when adjusting the amount of an award to match the *degree* to which a plaintiff prevailed on the merits, a district court must "provide a concise but clear explanation of its reasons." *Id.* at ——, 103 S.Ct. at 1942. The net result is to complicate somewhat the standard by which appellate courts must review trial judges' rulings regarding the proper size of awards.

**83.** A requirement that a recipient of attorneys' fees be a "prevailing party" is incorporated, for example, in the Civil Rights Attorney's Fees Awards Act, *see* note 16 *supra,* the pertinent provision of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b) (1976), as well as the EAJA, *see* notes 19, 22 *supra.*

ria by which trial judges' decisions that "special circumstances" warrant denying otherwise appropriate fee awards are evaluated by courts of appeals.[84] In sum, the diversity of the arguably relevant analogous standards of review, combined with the unusual character of the issue before us,[85] disables us from gaining significant guidance from the case law.

To determine the appropriate standard of review, consequently, we must advert to a combination of the general principles governing appellate review of district court judgments in civil nonjury cases [86] and the objectives underlying the EAJA.[87]

A few aspects of the issue may be settled quickly. First, any findings of fact made by a trial judge in the course of his ruling on a petition for attorneys' fees may be overturned only if "clearly erroneous." FED.R.CIV.P. 52(a).[88] The trial judge's conclusions on questions of law, by contrast, are not protected by Rule 52(a) and are subject to *de novo* review. *See Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Moreover, any determinations made by the trial judge that derive from application of legal standards to the facts of the case should be subjected to similar scrutiny; if the appellate court concludes that the judge's view of the law is incorrect, it may overturn the conclusions founded thereon. *United States v. Singer Manufacturing Co.,*

374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963).

Unfortunately, not all judgments made by district courts in the course of decisions regarding EAJA petitions fall into the foregoing familiar categories. Frequently, such judgments assume one of two unusual forms. First, they often consist of determinations, not whether a particular interpretation of the law is correct, but whether it is plausible or colorable. Judgments of this sort are somewhat anomalous in the appellate scheme. We have little difficulty, however, in concluding that they should be regarded as findings of law and reviewed as such. It would appear that, if anything, the special expertise and experience of appellate courts in assessing the relative force of competing interpretations and applications of legal norms makes the case for *de novo* review of judgments of this order even stronger than the case for such review of paradigmatic conclusions of law. Any uncertainty we might have regarding the appropriate classification of rulings of this kind is alleviated by consideration of the central purpose of the EAJA. The disincentive to challenge unreasonable governmental action caused by fear of incurring large litigation expenses [89] will be significantly reduced only if potential litigants are able to predict reasonably accurately whether they ultimately will be able to recover their attorneys' fees. Their ability

84. *See, e.g., Milwe v. Cavuoto,* 653 F.2d 80, 82–84 (2d Cir.1981); *Young v. Kenley,* 641 F.2d 192, 194–95 (4th Cir.1981), *cert. denied,* 455 U.S. 961, 102 S.Ct. 1476, 71 L.Ed.2d 681 (1982); *Perez v. University of Puerto Rico,* 600 F.2d 1, 2 (1st Cir.1979); *Bonnes v. Long,* 599 F.2d 1316, 1318–19 (4th Cir.1979).

85. We emphasize that, in this case, we are concerned only with the standard by which appellate courts should review trial judges' determinations regarding whether positions taken by the government were "substantially justified"; we express no opinion on the standards by which rulings on other kinds of issues involved in EAJA cases should be reviewed.

86. It seems apparent that a trial judge's findings regarding the strength of the position taken by the government in a particular case and his or her ensuing disposition of a petition for

attorneys' fees should be treated, for the purpose of determining the proper standard of review, as rulings in a civil nonjury case, regardless of whether the original action (in which the government did not prevail) was tried before a jury or before the bench.

87. *See* text at notes 38–43 *supra.*

88. The Supreme Court has defined that standard as follows:

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

89. *See* text at note 38 *supra.*

to make such predictions, in turn, is dependent on the *consistency* with which the EAJA is interpreted—*i.e.*, with which the justifications for (losing) legal arguments are assessed. Nondeferential appellate review of such assessments will best achieve a goal of consistency and thus enable the Act more effectually to serve its intended social functions.

█ The second atypical type of finding that commonly appears in EAJA decisions involves evaluations of the probative force of evidence submitted by the government. Frequently, the governing legal principles in a civil suit brought by or against the United States are undisputed, and the controversy revolves around competing characterizations of the underlying facts. When the government loses such a case and the prevailing party requests attorneys' fees, the trial judge must assess the plausibility of the government's original depiction of the situation that gave rise to the suit. Determinations of this order are difficult to classify. Insofar as they entail judgments concerning whether the government's submissions *would* have been sufficient to satisfy the pertinent legal standard had they not been overborne by the evidence presented by the private litigant, they bear some resemblance to rulings on so-called "mixed questions of law and fact," whose vulnerability to review by appellate courts is extraordinarily confused.[90] On balance, however, we think such judgments are more properly classified as factual findings. They involve the same kind of evaluation of the credibility of witnesses and weighing of evidence entailed by ordinary findings of fact—and at which trial judges are especially experienced and skilled. Moreover, considerations of judicial economy counsel strongly against subjecting such judgments to close scrutiny. Trial judges' explanations in EAJA cases of their assessments of

the probative value of the government's submissions frequently are sketchy.[91] If they knew that their determinations were to be examined *de novo,* judges would no longer confine themselves to such vignettes; to assist the reviewers (or to protect their judgments against reversal), they would feel obliged to describe and analyze the government's evidence in much more detail. The net result would be substantial waste of time and judicial resources. In sum, we conclude that, to the extent that trial judges' rulings regarding the strength of positions taken in litigation by the United States are based upon assessments of the probative value of the evidence offered by the government, they should be reversed only if "clearly erroneous."

An analogy may be helpful to clarify our holding regarding the appropriate standard of review. The problem in judicial administration that most closely resembles the one before us is appellate review of grants or denials of preliminary injunctive relief. Because such determinations most often are made prior to full-scale assessment of the merits of the case, the factual findings are frequently sketchy. *See United States Steel Corp. v. Fraternal Association of Steelhaulers,* 431 F.2d 1046, 1048 (3d Cir. 1970). And the rulings on questions of law incorporate a speculative element analogous to that embodied in EAJA determinations; the trial judge's findings are confined to assessment of "the validity, *or at least the probable validity,* of the legal premise underlying the claim of right in jeopardy of impairment." *Delaware & Hudson Railway Co. v. United Transportation Union,* 450 F.2d 603, 620 (D.C.Cir.) (emphasis added), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

Courts of appeals, sensitive to the unusual aspects of judgments regarding pre-

---

**90.** *See Pullman-Standard v. Swint,* 456 U.S. at 289 n. 19, 102 S.Ct. at 1790 n. 19; 9 C. Wright & A. Miller, Federal Practice and Procedure § 2589 (1971).

**91.** For example, in most instances when the government settles a case prior to final judgment, or the judge is able to decide the merits

of the case (in a manner favorable to the private litigant) without reaching all of the issues raised by the parties, the judge, in his subsequent ruling on an EAJA petition, offers only an abbreviated description of the controversy that gave rise to the suit.

liminary relief, have developed a standard for reviewing them that would work equally well in the present context. That standard is frequently described as one permitting reversal only for an "abuse of discretion." *See, e.g., Prendergast v. New York Telephone Co.,* 262 U.S. 43, 50–51, 43 S.Ct. 466, 469, 67 L.Ed. 853 (1923); *U.S. Steel v. Steelhaulers,* 431 F.2d at 1048; *A Quaker Action Group v. Hickel,* 421 F.2d 1111, 1115 (D.C.Cir.1969). But that ubiquitous phrase has a special meaning in this area. On one hand, it has been interpreted to require highly deferential review of district courts' tentative findings of fact; such determinations are not overturned unless "clearly erroneous" and, in practice, are rarely subjected to critical examination. *See Engine Specialties, Inc. v. Bombardier Limited,* 454 F.2d 527, 530 (1st Cir.1972); *U.S. Steel v. Steelhaulers,* 431 F.2d at 1048; *United States v. Ingersoll-Rand Co.,* 320 F.2d 509, 523 (3d Cir.1963). On the other hand, it allows for close scrutiny of district courts' rulings on questions of law. *See California ex rel. Younger v. Tahoe Regional Planning Agency,* 516 F.2d 215, 217 (9th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975); *Northeast Construction Co. v. Bird Associates,* 485 F.2d 752, 756 (D.C.Cir.1973); *Delaware & Hudson Railway Co. v. United Transportation Union,* 450 F.2d at 620–21. The same composite standard, we hold, should govern appellate review of district court dispositions of EAJA petitions.[92]

### III. The Merits of the Appellants' Petition

Now at last we can bring our analysis to bear on the case at bar. The appellants' principal contention on appeal is that the District Court erred in denying them attorneys' fees under section 2412(d)(1)(A) on the ground that the position taken by the NLRB was "substantially justified." In addition, they challenge the District Court's judgment that the Board did not act in "bad faith" in pursuing the litigation, and therefore was not liable for fees under section 2412(b). We consider those contentions in order below.

### A. Section 2412(d)(1)(A)

For the reasons indicated in Part II.B. *supra,* "the position of the United States," whose justification must be assessed, is the position taken by the Board in litigation before the District Court. That position was stated succinctly in the penultimate paragraph of the memorandum submitted by the Board in support of its motion for summary judgment:

> In summary, since the Board failed to contravene any express statutory command in denying plaintiffs' decertification petition or unit clarification petition, this Court should decline to exert jurisdiction to review the Board's actions under *Leedom v. Kyne.*[93]

To assess the strength of this argument, we must retrace the analytical path the Board itself traveled in its memorandum.

As the Board recognized, the touchstone of this controversy is the doctrine enunciated by the Supreme Court in *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed. 210 (1958). Ordinarily, determinations by the NLRB in representation proceedings are not subject to direct judicial review; only if such determinations form the basis of final orders issued in subsequent unfair labor practice proceedings can they be challenged in the courts. *Boire v. Greyhound Corp.,* 376 U.S. 473, 476–77, 84 S.Ct. 894, 896, 11 L.Ed.2d 849 (1964); *May Department Stores v. NLRB,* 326 U.S. 376,

---

92. The standards we adopt today are more stringent than those advocated by the NLRB in its brief. Our conclusions are consistent, however, with the position taken by the Justice Department in a case recently decided by the Ninth Circuit. *See* Reply Brief for the Federal Appellant at 2–6, *Hoang Ha v. Schweiker,* 707 F.2d 1104 (9th Cir.1983) (discussed in note 80 *supra*).

93. Memorandum in Support of Defendants' Motion to Dismiss or, In the Alternative, For Summary Judgment, and Response In Opposition to Plaintiffs' Motion for Summary Judgment at 13 (Feb. 28, 1980), Record 9.

379, 66 S.Ct. 203, 206, 90 L.Ed. 145 (1945); *AFL v. NLRB,* 308 U.S. 401, 409, 60 S.Ct. 300, 304, 84 L.Ed. 347 (1940). In *Leedom v. Kyne,* the Court carved out a very narrow exception to this general principle: when the Board acts in a manner that contravenes an express statutory prohibition and the aggrieved party has no alternative way of securing relief, a district court has the authority to review the Board's determination. 358 U.S. at 188–90, 79 S.Ct. at 183–84. As this and other courts have repeatedly emphasized, the doctrine enunciated in *Kyne* may be invoked only in extraordinary circumstances.

> [T]o say that there are possible infirmities in an action taken by the Board by reason of an erroneous or arbitrary exertion of its authority in respect of the facts before it is not to conclude that there is jurisdiction in the District Court to intervene by injunction. For such jurisdiction to exist, the Board must have stepped so plainly beyond the bounds of the Act, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court even before the Board's own processes have run their course.

*Local 130, International Union of Electrical, Radio & Machine Workers v. McCulloch,* 345 F.2d 90, 95 (D.C.Cir.1965); *accord Boire v. Greyhound Corp.,* 376 U.S. at 481, 84 S.Ct. at 898; *Modern Plastics Corp. v. McCulloch,* 400 F.2d 14, 17 (6th Cir.1968); *Machinery, Scrap Iron, Metal & Steel Chauffeurs, Local Union No. 714 v. Madden,* 343 F.2d 497, 499 (7th Cir.), *cert. denied,* 382 U.S. 822, 86 S.Ct. 53, 15 L.Ed.2d 69 (1965).

In their complaint, the appellants pointed to section 9(b) of the National Labor Relations Act (as amended) as an express statutory limitation on the Board's power, and argued that the Board's transgression of that boundary warranted exercise of jurisdiction by the District Court. That section directs the Board to define "units" of em-

ployees appropriate for collective bargaining purposes but provides that:

> the Board shall not . . . decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit . . . .[94]

The Board responded that its refusal to grant the appellants the forms of relief they originally requested was not so clearly proscribed by this provision as to justify intervention by the District Court. The Board offered two main arguments in support of its position. First, it insisted that the statute only forbids it to *"decide"* that a unit containing both professionals and non-professionals is appropriate for collective bargaining.[95] But, so the Board argued, in the instant case it never "decided" that such a unit was appropriate; it merely refused to reconsider the appropriateness of a unit that had been established long ago (and before the enactment of the proviso in question) through the voluntary action of the Company and the Union. Consequently, it violated no statutory mandate.

Second, the Board claimed that its interpretation of the statutory proviso is supported by important policy considerations that underlie the National Labor Relations Act as a whole. The Board's general obligation under the Act is to promote two goals: (1) employees' freedom of choice in deciding whether they want to engage in collective bargaining and whom they wish to represent them; and (2) the maintenance of established, stable bargaining relationships. *See J.I. Case Co. v. NLRB,* 321 U.S. 332, 338–39, 64 S.Ct. 576, 580–81, 88 L.Ed. 762 (1944). When those goals conflict, the Board's job is to strike a sensible balance between them. The Board argued that its interpretation of its power and duty, under section 9(b), to accommodate the desires of

---

**94.** *See* note 3 *supra.*

**95.** Thus, the Board acknowledges that it is forbidden to order a representation election in a unit that includes both professionals and non-

professionals, without first affording the professionals an opportunity to conduct a separate election. *See, e.g., Sonotone Corp.,* 90 N.L.R.B. 1236, 1240–41 (1950).

disgruntled professionals is shaped by its overarching statutory mandates; it has adopted a set of policies designed to maximize the freedom of choice of both professional and non-professional employees while minimizing the potential for needless disruption of existing bargaining relationships. Thus, it is willing to accord groups of professional employees separate self-determination elections in contexts in which such a proceeding would contribute to overall improvement of a bargaining relationship: when either an employer or a union petitions for a representation election in an overall mixed unit, *see Westinghouse Electric Corp. (X-Ray & Industrial Electronics Div.)*, 129 N.L.R.B. 846, 847–48 (1960); *Westinghouse Electric Corp.*, 116 N.L.R.B. 1545, 1547 (1956), and when a rival union petitions for an election designed to sever a group of professionals from an existing mixed unit, *see Westinghouse Electric Corp. (Small Motor Div.)*, 111 N.L.R.B. 497, 501 (1955); *S.S. White Dental Manufacturing Co.*, 109 N.L.R.B. 1117, 1123 (1954); *Union Switch & Signal Co.*, 76 N.L.R.B. 205, 209 (1948). But the Board will not order a separate election when professionals, through a decertification petition, seek merely to be "unrepresented." *See Retail Clerks Union Local No. 324 (Vincent Drugs)*, 144 N.L.R.B. 1247, 1252 (1963) (dicta); *Westinghouse Electric Corp.*, 115 N.L.R.B. 530, 532–33 (1956); *Great Falls Employers Council, Inc.*, 114 N.L.R.B. 370, 371 (1955). In the last-mentioned context, the value of preserving an existing, generally satisfactory bargaining relationship, the Board maintains, overbalances the value of allowing the professionals complete freedom of choice.

Did the District Court err in concluding that the foregoing arguments were "substantially justified"? Before addressing that question, we observe that the facts of this controversy are undisputed and that the District Court's evaluation of the strength of the Board's position derived solely from the court's assessment of the Board's *legal* arguments. Under these circumstances, we are obliged to examine closely the District Court's determinations. *See* Part II.D. *supra.*

We conclude that, under the standards set forth in Part II.C. *supra* for measurement of the force of the government's arguments, the Board's *litigation position* (founded on the jurisdictional arguments gleaned from *Leedom v. Kyne*) was clearly *substantially justified.* The Board's parsing of the word "decide" in the statutory proviso we find sufficiently plausible to support a "substantially justified" claim that the District Court should not exercise jurisdiction. And the Board's argument that any ambiguity in the statutory language should be resolved in its favor, in view of the nature of its general obligations under its enabling act, we conclude falls within the bounds of "reasonableness." [96]

Any doubts we might have concerning the foregoing conclusions are dispelled by reference to the three criteria enunciated in Part II.C. *supra* for deciding borderline cases. First, the Board's litigation position certainly was not inconsistent with any clearly established law; at the time the Board took and defended its position in litigation, no court had held that Section 9(b)(1) so clearly requires the Board to hold a separate decertification election upon the petition of a group of professional employees as to allow a district court to exert jurisdiction in order to compel the Board to do so if it refuses. Second, litigation of the issues raised by the Board was not likely to be difficult or time-consuming; the parties submitted short memoranda in support of their motions for summary judgment and, had the Board not reversed its position while the case was pending, it is likely that the District Court would soon have ruled on the motions. Third, the position taken by

---

**96.** We, of course, are not obliged to—and do not—decide that the Board's construction of the proviso is *correct,* or even that it would constitute a "substantially justified" argument if presented to a court authorized to examine *de novo* the Board's interpretations of its enabling act; we hold merely that it was "substantially justified" in the forum and under the circumstances in which it was asserted.

the Board certainly did not constitute a departure from established policy; since at least 1955, the Board had consistently refused to grant decertification elections in units not coterminous with existing bargaining units, regardless of whether the existing units had been established originally pursuant to an election or through the voluntary consent of an employer and a union, and regardless of whether the professional employees in the unit had ever been accorded a separate self-determination election.[97] Therefore, this was not a case where the appellants were singled out for unduly harsh or disparate treatment by the government.

It is important to recognize that, in this case, we need not speculate much about the Board's position on the merits of the appellants' claim. This is so because the Board's *litigation position*—grounded on *Leedom v. Kyne*—was well founded and very likely would have barred the District Court from accepting jurisdiction over the appellants' suit. Indeed, on the facts of this case, even if the Board itself had conceded that its long-standing policy on decertification petitions was patently erroneous, the District Court very likely would not have had jurisdiction to decide the merits. In other words, if the matter had been fully litigated, it is highly doubtful that the appellants could have been "prevailing parties" because the District Court probably was without authority to hear their case. As it turned out, the appellants were properly found to be "prevailing parties" because the case was dismissed as moot without a decision on the jurisdictional issue; this does not, however, alter our finding that the government's litigation position was substantially justified.

In sum, we agree with the District Court that the litigation position taken by the NLRB was substantially justified and, consequently, that the appellants are not entitled to attorneys' fees under section 2412(d)(1)(A) of the EAJA.

### B. Section 2412(b)

▮ The appellants' second contention—that the court erred in concluding that the appellants are not entitled to fees under the now-codified "bad faith" exception to the American Rule—merits only brief attention. There may be cases in which the

---

**97.** *See, e.g., Westinghouse Elec. Corp.,* 115 N.L.R.B. at 532–33; *Great Falls Employers Council, Inc.,* 114 N.L.R.B. at 371. *Cf. Retail Clerks Union Local No. 324,* 144 N.L.R.B. at 1252 (rejecting [in a § 10 complaint proceeding involving the validity of a contract] the employer's argument that the extant bargaining unit was inappropriate because it included both professionals and nonprofessionals and the former had never voted for inclusion in the unit, reasoning that "nothing in Section 9(b)(1) or its legislative history . . . suggest[s] that Congress intended that section to invalidate as inappropriate a historically established contract unit simply because of a joinder of professional and nonprofessional employees"); R. GORMAN, BASIC TEXT ON LABOR LAW 49 (1976):

> It should be noted that the incumbent union which is the object of [a decertification] petition need not have been certified in the first instance but may have secured representational rights through informal employer recognition. The unit in which the election is held must be the same as the established bargaining unit; a smaller election unit may not be split off for purposes of decertification.

The appellants dispute this characterization of the Board's general policy. They point out that in 1948 (just after passage of the Taft-Hartley Act), in a case very similar to the one before us, the Board did grant a decertification election pursuant to a petition filed by a group of professional employees who had originally been included in a bargaining unit as a result of an agreement between an employer and a union. *See Illinois Bell Tel. Co.,* 77 N.L.R.B. 1073, 1076–77 (1948). And they make much of the fact that, in its 1981 decision granting them the relief they sought, the Board opined that "*Westinghouse Electric* did not overrule *Illinois Bell,* but reached a different result based on policy considerations." *Utah Power & Light Co.,* 258 N.L.R.B. at 1061 n. 13. The appellants are unable, however, to point to any case, in the 35 years since the decision in *Illinois Bell,* in which the Board has granted a separate decertification election to a group of professionals in a situation comparable to their own. Nor does it appear that the Board, after its decision in *Westinghouse* and prior to its final decision in *Utah Power,* ever expressed its willingness to grant such an election or in any way acknowledged the viability of *Illinois Bell.* Under these circumstances, we are unable to conclude that the position first taken by the Board in response to the appellants' request constituted a departure from established policy.

assertion of "substantially justified" legal arguments can fairly be characterized as vexatious, wanton, or oppressive, but this is certainly not one of them. In seeking dismissal under *Leedom v. Kyne,* the Board was merely asserting a well-established rule limiting the jurisdiction of the district courts to decide representation questions under the NLRA. Even on the merits of the underlying dispute, there is no evidence in the record that the Board was doing anything other than defending a routine application of its longstanding policy for dealing with decertification petitions of the sort submitted by the appellants. The fact that the Board (after a change in its membership) later altered that policy and acceded to the appellants' demands in no way suggests that its original defense of its position was not undertaken in "good faith." Accordingly, the District Court properly concluded that the appellants are not entitled to attorneys' fees under section 2412(b) of the EAJA.

### CONCLUSION

For the foregoing reasons, the judgment of the District Court is

*Affirmed.*